Schuster, Plaintiff in error, vs. The State, Defendant in error.

*May. 12 — June 3, 1891.*

Criminal Law and Practice. (1) *Sufficiency of evidence: Alibi.* (2, 3) *Cross-examination: Contradiction of witness: Immaterial error.* (4, 5) *Unwilling or hostile witness.* (6) *Evidence as to when and how* alibi *was asserted.* (7) *Competency of juror: Citizenship: Evidence.* (8) *New trial: Hearing of motion.*

1. The evidence in this case is *held* sufficient to sustain a conviction for an assault with intent to kill, although many witnesses testified that the defendant was in a distant city on the day the crime was committed.

2. The defendant's father, as a witness for the defense, was asked on cross-examination whether he had said to one S. that if a certain witness testified that his son was at his house on the day of the crime he would have her taken up, which he admitted; also, whether he had requested S. to conceal his son should he be found, which he denied. *Held,* that such cross-examination did not relate to collateral matters irrelevant to the issue, and that the prosecution was not bound by his denial, but might call S. as a witness to contradict him.

3. An error in permitting S. to testify to the threat which defendant's father had admitted making, was immaterial.

4. A witness for the state was asked if he saw the defendant on the day of the crime, and answered in the negative. The trial court permitted the prosecuting attorney to ask him whether he had not, at different times, stated that he saw the defendant on that day, and to cross-examine him on the subject, as an unwilling witness. *Held,* that this court cannot say, from the record, that this was error.

5. Where a witness unexpectedly gives testimony adverse to the party calling him, such party may ask him if he has not, on another particular occasion, made a contrary statement.

6. Evidence offered by the defendant that the people of a distant city asserted, from the time of the arrest, that he was in that city on the day of the crime, and that they took steps so to inform the authorities of the county in which the crime was committed, was properly rejected.

7. A juror testified on *voir dire* that he was a citizen of the United States. On motion for a new trial, defendant's attorney deposed that the juror stated to him, after the trial, that he came to this country from England, where he was born, and that he had never completed his naturalization. *Held:*

(1) Even if competent, this evidence did not prove the disqualification of the juror, since it failed to show that his parents had not become naturalized while he was a minor, or that they were not natives of the United States.

(2) The evidence was mere hearsay, and inadmissible.

8. A motion for a new trial must be *heard* by the trial judge, but he need not, in every case, allow counsel to make a special oral argument in support thereof.

ERROR to the Circuit Court for *Sauk* County.

The plaintiff in error, *August Schuster*, was tried at the September term, 1890, of the Sauk County circuit court on an information charging in due form that on February 7, 1890, at said county, he feloniously made an assault with a dangerous weapon, to wit, a club, on one Rosa Sackman, and did therewith beat and bruise her, with intent to kill and murder her. The jury found him guilty of the offense charged. A motion for a new trial, based upon affidavits tending to show that one of the jurors was not a citizen of the United States, and that another juror had expressed opinions before the trial that the accused was guilty of the offense charged, and was thus disqualified for prejudice, was denied. A motion for a new trial, founded on the minutes of the judge, was also denied. The court sentenced the accused to imprisonment in the state prison for not less than one nor more than fifteen years, in the form of sentence prescribed by sec. 4733, R. S., as amended by ch. 390, Laws of 1889 (S. & B. Ann. Stats. sec. 4733).

The alleged crime was committed at the residence of one Klump, an uncle of Rosa Sackman, with whom she resided, situated on the road between Baraboo and North Freedom, in Sauk county, and near the Baraboo river. Rosa was twenty-two years of age. She was alone in the house at the

time, her uncle and aunt being absent at North Freedom. She testified that *August Schuster* came into the house on the afternoon of February 7, 1890, and asked for food. She prepared some food for him, and he sat down at the table and ate it. He then seized her, tied her hands behind her with her apron strings, tied her feet with a cord which he took from his pocket, and threw her upon the floor. That before doing so he attempted to compel her to take something from a bottle he took from his pocket, which she said smelled like carbolic acid, and she thought it was mixed with something else. She successfully resisted taking the contents of the bottle, but the liquid was poured over her face and neck, which were burned by it. She called him by name, but he denied that he was *August Schuster*. He then demanded the money her uncle had belonging to the school district, of which the latter was treasurer and had been for many years. She refused to tell him where the money was. He searched for it in different rooms, but unsuccessfully. He also struck her with a stick of stove-wood, and kicked her several times, violently, on different parts of her person, and threatened to kill her by inches, and to drown her in the river. He then dragged her out of the house towards the river, but before reaching it a wagon was heard approaching, and he dropped her and fled.

She had attended school nine or ten years before with *August*, who then lived with his father in the same school district, and was then quite intimate with him and his brothers and sisters. She had seen him but once afterwards, and that was two years before the assault was committed upon her. She then spoke to him. She testified with much positiveness that *August Schuster*, the accused, was the person who committed the outrage upon her, and recognized him at once as such person when he came into her presence after his arrest. She also described the clothing worn by her assailant, which corresponded with that found in the possession of *August* when arrested.

When Mr. and Mrs. Klump returned home later in the afternoon they missed Rosa. Search was immediately instituted for her, and she was found near the river, insensible, her hands and feet tied in the manner above stated, and her face and neck burned and blistered. They found the table prepared for one person, found a stick of stovewood on the floor, and bureau and stand drawers disordered and partly emptied of their contents. Rosa remained insensible most of the time until the next morning. She testified before the examining magistrate in February, and again on the trial in September; in both cases, however, at her home, being unable to attend the court by reason of her injuries. We find no material discrepancies in her testimony or in any statements of the occurrence made by her in or out of court. She has always firmly maintained that *August Schuster* is the person who committed the outrage upon her. For several years Rosa has been subject to occasional fainting fits, which seem to be of an epileptic character; and in 1888 she had two attacks of paralysis. These attacks, after they passed off, do not seem to have affected her memory or mental faculties very perceptibly. Since she was assaulted, and during the same year, she has had other attacks of paralysis. Her testimony was taken at her home; the judge, jury, attorneys, and accused attending for that purpose. She fainted before it was completed, and could proceed no further. So much of her testimony as was then taken, and her testimony before the examining magistrate, was read on the trial, by stipulation, as her testimony in the case. One Barbara Meyer testified on the trial that she knew *August,* and that she saw him at the house of his father in North Freedom (which is two miles from Klump's house) on the morning of February 7, 1890. Other witnesses testified that on the afternoon of that day they saw a person, dressed as Rosa testified the man who assaulted her was dressed, walking on the railroad track in the same

vicinity.   Mrs. Collins, who taught the school attended by Rosa and *August* nine or ten years before, and who had seen him but once since, readily recognized *August* when she saw him in court.   Soon after his arrest he denied to one of the witnesses that he knew the young lady who had been assaulted, and the witness, who was the sheriff of Sauk county, thought he denied ever having been at North Freedom.

The testimony on the part of the defense was almost entirely directed to proving an *alibi*.   It appears that *August* had left his home in Sauk county a year or two before the alleged offense was committed, and it was not definitely known where he was most of the intervening time.   During such time he attempted to commit suicide in the city of Madison, by shooting himself.   For several months thereafter no one in Sauk county seems to have known anything about him.   However, he went to Watertown, in this state, and in October, 1889, was employed in a hotel in that city under the assumed name of Arthur Lewis, and continued in such employment until his arrest on this charge, about two weeks after Rosa was assaulted.   His father, and his brother and sister, who were members of his father's family, testified that *August* was not at his father's house February 7th, as testified to by Barbara Meyer.   Thirteen witnesses were examined for the defense concerning *August's* presence in Watertown on that February 7th, and each of them testified, more or less positively, to seeing him there on that day, engaged in the performance of the duties of his employment.   It appears that, as the railroads ran at that time, it required from 7 o'clock P. M. until midnight to go from Watertown to North Freedom.   The time required for returning to Watertown does not appear.

The testimony is very voluminous.   About forty witnesses were examined on the trial, and the cross-examina-

tions of many of them on both sides were searching and protracted. The above statement is but an outline of the testimony, but is believed to be sufficient to give a correct idea of the respective theories of the prosecution and defense, and the general features of the case. Some further statement of the case, including the errors assigned for a reversal of the judgment, will be found in the opinion.

*J. A. Buckley,* attorney, and *G. Stevens,* of counsel for the plaintiff in error, contended, *inter alia,* that the verdict should have been set aside because of the alienage of the juror Briggs. R. S. sec. 2524; *People v. Reese,* 4 Am. Cr. Rep. 527; *Lamphier v. State,* 70 Ind. 317; *Read v. State,* 12 S. W. Rep. 413; *Pearcy v. Mich. Mut. L. Ins. Co.* 111 Ind. 59; *State v. Vogel,* 22 Wis. 471; *Jeffries v. Randall,* 14 Mass. 205; *Watts v. Ruth,* 30 Ohio St. 32; *Schumaker v. State,* 5 Wis. 324; *Hill v. People,* 16 Mich. 351. The trial court erred in permitting the impeachment of Adam Schuster, as a witness for the accused, by the testimony of the witness Sweet, upon collateral and irrelevant matters drawn out upon cross-examination for the purpose of impeachment. 1 Greenl. Ev. secs. 449, 462; *Austin v. Austin,* 45 Wis. 523; *Baker v. State,* 69 id. 32; *Humphrey v. State,* 78 id. 569; *Hughes v. Rogers,* 8 Mees. & W. 123; *Stokes v. People,* 53 N. Y. 164; *Davies v. Keyes,* 112 Mass. 436. The court erred also in permitting the counsel for the state to examine one of their own witnesses in the manner of an ordinary cross-examination for the purpose of discrediting him. 1 Greenl. Ev. secs. 442–445; *Comm. v. Welsh,* 4 Gray, 535; *Sanchez v. People,* 22 N. Y. 147; *Babcock v. People,* 13 Col. 515. It was an abuse of discretion to refuse to hear argument on the motion for a new trial upon the minutes. *Ohms v. State,* 49 Wis. 415; *Manning v. State,* 79 id. 178.

The *Attorney General,* for the defendant in error, argued, among other things, that the hearsay evidence in the affidavit of the attorney was insufficient to impeach the

verdict. The juror's own affidavit or deposition should have been taken. R. S. sec. 4101; *Brown v. La Crosse C. G. L. & C. Co.* 21 Wis. 51. The alienage of a juror, while it may be a good ground of challenge, is not a sufficient ground for setting aside the verdict in a cause not capital, even though the fact was unknown to the accused when the jury was impaneled. *State v. Vogel,* 22 Wis. 471. A cause of challenge not discovered until after the verdict, is not *per se* a ground for new trial. This doctrine has been held where jurors were aliens: *Brown v. La Crosse C. G. L. & C. Co.* 21 Wis. 51; *Hollansworth v. Duane,* 4 Dall. 353; *State v. Quarrel,* 2 Bay (S. C.), 150; *Presbury v. Comm.* 9 Dana (Ky.), 203; *Jones v. People,* 2 Col. 351; *Chase v. People,* 40 Ill. 352; *Mt. Desert v. Cranberry Isles,* 46 Me. 411; *Hull v. Albro,* 2 Disney (O.), 147; *Thompson v. Page,* 16 Cal. 78. Where a juror was not a citizen of the county or state: *Rosborough v. State,* 43 Tex. 570; *Costly v. State,* 19 Ga. 614. Where a juror was related to a party within one of the disqualifying degrees: *McClellan v. Crofton,* 6 Me. 307; *Orme v. Pratt,* 4 Cranch C. C. 124; *Smith v. Earle,* 118 Mass. 531; *Baker v. State,* 4 Tex. App. 227. And where a juror was shown to have expressed disqualifying opinions as to the subject matter of the trial: *Taylor v. Greely,* 3 Me. 204; *Kennedy v. Comm.* 14 Bush (Ky.), 340; *Romain v. State,* 7 Ind. 67; *Keener v. State,* 18 Ga. 194; *Simpson v. Pitman,* 13 Ohio 365; *State v. Howard,* 17 N. H. 171, 198; *State v. Shelledy,* 8 Iowa, 477. But a cause of challenge not discovered until after verdict may be a ground for a new trial in the discretion of the court. *Woodward v. Dean,* 113 Mass. 297–8; *State v. Boon,* 80 N. C. 461; *State v. Pike,* 20 N. H. 344. The failure of counsel to inquire into the question of the alienage of the juror amounts to a waiver of the cause of challenge. *Jeffries v. Randall,* 14 Mass. 205; *State v. Patrick,* 3 Jones' Law (N. C.), 443; *Tweedy v. Briggs,* 31 Tex. 74; *People v. Chase,* 40 Ill. 352;

*Estep v. Wattress,* 45 Ind. 140; *Alexander v. Dunn,* 5 id. 122; *Croy v. State,* 32 id. 384; *State v. Parks,* 21 La. Ann. 251; *Beck v. State,* 20 Ohio St. 228; *Wilder v. State,* 25 id. 555; *Collier v. State,* 20 Ark. 36; *Keener v. State,* 18 Ga. 194; *State v. Shelledy,* 8 Iowa, 477; *State v. Funck,* 17 id. 365.

Lyon, J.  The plaintiff in error seeks a reversal of the judgment against him on two general grounds.   He maintains (1) that the testimony is insufficient to support a conviction; and, if held sufficient, then (2) that several erroneous rulings were made by the court during the progress of the trial, either of which is claimed to be fatal to the judgment.   The errors thus assigned will be considered in their order.

· I. Is the testimony sufficient to support the verdict of guilty?   We think this question must be answered in the affirmative.   That some person committed the offense charged in the information is not controverted, and could not be successfully controverted under the testimony, for the proof thereof is overwhelming.   The testimony of Rosa Sackman, if true, establishes the guilt of *August Schuster.* Her testimony was not conclusively proved to be false.   It was attempted to impeach its accuracy in but one way, which was by showing that *August* was not at the place where the crime was committed when it was committed, but was then in the city of Watertown, eighty miles or more distant from such place.   True, many witnesses testified that he was then in Watertown.   This testimony is abundantly sufficient to support a finding to that effect, had the jury so found; but it is not conclusive of the fact. We have here testimony of the existence of two alleged facts, only one of which can be true, and neither of which is conclusively proved.   It is the function of the jury to determine which of these conflicting propositions of fact is

true. The jury believed the testimony of Rosa, and their verdict of guilty was the logical result. This did not necessarily impeach the integrity of the witnesses whose testimony tended to prove the alleged *alibi*, but only the accuracy of their recollection. These witnesses may have seen *August* in Watertown under the circumstances testified to by them, and at the same time be honestly mistaken as to the precise day they thus saw him there. There is no element in any of this testimony which stamps it as conclusive of the facts testified to. If the testimony impresses upon our minds the conviction that it preponderates against the verdict, that is not sufficient. The court must be able to say that there is no evidence to support the verdict, or that facts inconsistent therewith are conclusively proved, or it cannot disturb the verdict for defect in the testimony. To do so because we think the evidence preponderates against the verdict would be to usurp the functions of the jury. *Yanke v. State*, 51 Wis. 464. This court is sometimes compelled to affirm judgments which would be reversed without hesitation were the court competent to determine the relative weight of conflicting testimony. We refrain, however, from saying that this is such a case. For the reasons above suggested we cannot reverse the judgment for want of evidence to support the verdict.

II. We are now to consider the several rulings of the court made during the trial, including the denial of the motions for a new trial, which are assigned for error.

1. Adam Schuster, the father of *August*, was called as a witness for the defense, and testified that *August* was not in the house of witness on February 7, 1890, as stated by Barbara Meyer. On cross-examination he was asked by the district attorney whether he had said to one Sweet that if Barbara Meyer testified *August* was there at that time he would take her up. The witness substantially admitted

that he said so.   He was then asked if he requested Sweet
to conceal *August*, should he be found.  The witness denied
making any such request.   Sweet was then called as a wit-
ness by the prosecution, and the corresponding questions
were put to him.   These questions were objected to on the
ground that the testimony thus given by Adam Schuster
related to collateral matters, irrelevant to the issue, hence
not proper cross-examination, and that the state was bound
by his answers, and could not be heard to contradict the
witness.

It is legitimate cross-examination to interrogate an op-
posing witness as to his relations to the parties and the
litigation, his motives, interests, inclinations, and prejudices,
his means of obtaining correct and certain knowledge of
the facts to which he testifies, and the manner in which he
has used those means.   1 Greenl. Ev. § 446.   Such testi-
mony is not collateral and irrelevant to the issue, and the
party calling it out, if it be adverse to him, may contradict
it by other testimony for the purpose of discrediting the
witness.   All this is quite rudimentary in the law of evi-
dence.

The questions put to Adam Schuster by the district at-
torney went to his motives, inclinations, and prejudices in
respect to the prosecution of his son, and were, therefore,
proper cross-examination.   When he denied that he solicited
Sweet to conceal *August*, should he be found, it was com-
petent for the prosecution to contradict him by other proof.
Having admitted the threats against Barbara Meyer, per-
haps it was irregular to permit Sweet to testify to the same
thing.   Certainly his testimony was unnecessary and un-
important, but the defense could not have been injured
thereby.   Hence it was not reversible error.

2. One Fred. Schulte was called as a witness by the pros-
ecution, and testified that he knew *August Schuster*.   The
district attorney then asked him if he saw *August* on Feb-

ruary 7, 1890, and he answered in the negative. He was then asked by the district attorney, in a variety of forms, whether he had not stated to several persons at different times that he saw *August* on that day in the village of Ableman (which is in Sauk county), and relating to many circumstances connected with such statements. The testimony was received under objection. The district attorney was also allowed, under like objection, to put leading questions to the witness,— in fact to cross-examine him on those subjects. Schulte denied having made such statements. It is claimed that the foregoing rulings were erroneous.

If Schulte was an unwilling witness, the rule is that the court might, in its discretion, permit leading questions to be put to him by the party calling him. While we cannot say from a mere perusal of his testimony that Schulte was an unwilling witness, yet he may have shown himself to be such in a variety of ways, plainly discernible by the trial judge, which are not disclosed in the written testimony, and which could not be delineated upon paper. In the nature of the case, no one can determine whether a witness is a willing or an unwilling one so accurately as the judge who sees him and hears him testify, and takes note of his bearing and deportment on the stand. In this case the judge evidently determined that Schulte was an unwilling witness. We cannot say he erred in so doing. Hence we cannot say that it was error to permit leading questions to be put to him by the party calling him. *Baker v. State*, 69 Wis. 32.

There is some conflict of authority as to whether, if a witness unexpectedly gives testimony adverse to the party calling him, such party may ask him if he has not, on another particular occasion, made a contrary statement. But we think the cases which hold that the witness may be thus cross-examined by the party who called him are supported by the better reasons. There is force, no doubt, in the ob-

jection that the jury are liable to infer from this course of examination that the fact suggested by it is true. In this case the fact thus suggested is that Schulte saw *August* in Ableman, on the day in question. But any danger of such inference being drawn by the jury may readily be removed by an instruction that no such inference is permissible. No such instruction was asked in this case. Had it been, doubtless the court would have given it. See, on this subject, 1 Greenl. Ev. § 444, and notes; *Melhuish v. Collier*, 15 Q. B. 878. We conclude, therefore, that it was within the legal discretion of the court to allow the prosecution to examine Schulte in the manner he was examined.

3. The court rejected testimony offered on the part of the accused to show that the people of Watertown asserted the alleged *alibi* from the time of the arrest of *August*, and that steps were at once taken to assert the fact that *August Schuster* was in Watertown on February 7, 1890, and to inform the authorities of Sauk county thereof. This, in substance, was an attempt to show that the people of Watertown did not believe *August* guilty of the crime charged, and at once asserted his innocence when the charge was made. We are aware of no rule of evidence under which such testimony is admissible. The authority cited to sustain the rule (Wills, Circ. Ev. p. 133) fails to sustain it. Of course it was proper to interrogate the witnesses whose testimony tended to prove the alleged *alibi* (and they were so interrogated) as to when their attention was first called to the charge against *August*, and the date of the commission of the alleged crime, for this circumstance might materially affect the weight of their testimony. But no such witness could properly be asked, on his direct examination, what steps he took to inform the Sauk county officials that *August* was in Watertown when the crime was committed.

4. The proceedings of the court on the motions for a new

trial are sufficiently stated in the argument of the learned counsel for the plaintiff in error as follows: " After verdict, and before sentence, the attorneys for the accused made and filed a motion to set aside the verdict and grant a new trial upon the minutes of the court. Thereafter, and before sentence, upon affidavits duly filed, the court made an order to show cause why the verdict should not be set aside, for the reasons: *First*, that one of the jurors who served upon the said trial, to wit, Edmund Briggs, was not a citizen of the United States; and, *second*, that one of the jurors who served upon the said trial, to wit, L. O. Holmes, had formed and expressed an opinion, before the trial, in regard to the merits of the case, and was prejudiced against the accused. After the reading of affidavits and hearing argument thereon a new trial upon the grounds set forth in the said order was denied by the court. Thereafter, and before sentence, counsel for the accused asked to be heard upon the motion for a new trial upon the minutes of the court, previously duly made and filed, but the court refused to hear argument upon the said motion, and then and there overruled the same." When the last ruling was made the judge stated that since the filing of said motion for a new trial on the minutes of the court he had considered the questions raised by said motion, that the same were fresh in his recollection, and therefore he did not care to hear argument upon the same.

Before the jury were sworn the juror Briggs was examined under oath, concerning his qualifications to sit as a juror in the case. He testified, among other things, that he was a citizen of the United States, and was thereupon sworn and acted as a juror in the case. On the hearing of the motion for a new trial the only proof impeaching the truth of his statement that he was a citizen, was the affidavit of Mr. Grotophorst, one of the attorneys for the defense, who deposed therein that after the trial Briggs stated

to him that he came to this country in 1857, from England, where he was born; that he took no steps to become a citizen of the United States, except that, about 1868, he declared his intention to become such; that he had voted a great many times, and always thought that was sufficient to make him a citizen.

If the foregoing affidavit is competent evidence to prove the disqualification of Briggs, it fails to prove the fact. The act of Congress of April 14, 1802, sec. 4, on the subject of naturalization, provides that "the children of persons who have been duly naturalized under the laws of the United States . . . being under the age of twenty-one years at the time of the naturalization of their parents, shall, if dwelling in the United States, be considered as citizens thereof; and the children of persons who now are or have been citizens of the United States shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States." See abstract of the laws of the United States in relation to the naturalization of aliens. R. S. 1858, p. 1089. It may be true that Briggs is an alien and never perfected his naturalization in court, yet his parents may have become fully naturalized citizens during his minority and since he came to this country, or they may have been natives of the United States, and, of course, citizens thereof. In either case Briggs would have been a citizen of the United States without naturalization. In order to show that he was not a qualified juror because of alienage it was incumbent upon the plaintiff in error to negative the existence of the conditions above suggested.

Moreover, the testimony contained in the affidavit of Mr. Grotophorst was mere hearsay, and should not have been received. If such testimony is received, any juror may, after trial and verdict, make statements out of court, not under oath, which, on proof that he made them, and without any evidence of their truth, might impeach the verdict

he joined in rendering.   The solemn verdicts of jurors would be worth little could they be so easily overthrown.

As to the alleged incompetency of the juror Holmes because of prejudice, it is sufficient to say that the question of his prejudice was fully tried by the court on his statements when examined on oath as to his competency as a juror, and on conflicting affidavits upon the question.   On the testimony before him the learned circuit judge held that Holmes was not prejudiced and was therefore a competent juror.   There is testimony, although disputed, sufficient to support the finding, and this court cannot disturb it.

5. The only remaining question is, Was it error on the part of the court to refuse to listen to an argument on the motion for a new trial on the minutes of the court?   There is no imperative rule of law which makes it obligatory upon the trial judge to listen to oral argument in support of every motion for a new trial which comes before him. Frequently, perhaps usually, the judge desires argument at the bar on such motions to refresh his recollection of the case and enlighten his judgment.   But it may sometimes happen that he is so fully possessed of the case and the law of it that the argument of such motion would be a waste of time.   What the law does require is that the motion shall be *heard* by the judge who presided at the trial.   This is the rule of *Ohms v. State,* 49 Wis. 415.   This does not necessarily mean that counsel shall be allowed in every case to make a special oral argument to the court in support of the motion.   It means that the judge should know the history of the case, and the facts thereof, and, in the light of such knowledge, should give to the question whether a new trial should be granted or denied calm, full deliberation and the exercise of his best judgment.

There is sufficient in the record of this case to show that the plaintiff in error was defended with great zeal and ability by his counsel, and that the case was fully argued

by such counsel to the jury. The charge of the learned judge who presided at the trial (to which no exception was taken) shows the most accurate knowledge of the case on his part. After the motion for a new trial on the minutes was made, and before it was determined, another such motion, because of the alleged disqualification of jurors, was made and argued. This argument must have refreshed the memory of the judge upon the history and facts of the case. Under these circumstances, we cannot doubt that the judge was fully prepared to decide the motion when he decided it, and that further discussion of the case would not have aided him in reaching a correct conclusion.

These views dispose of all the exceptions alleged for reversal adversely to the plaintiff in error. Hence the judgment of the circuit court must be affirmed.

*By the Court.*— Judgment affirmed.