CASE 49—INDICTMENT AGAINST CALEB POWERS FOR MURDER—MARCH 28.

## Powers v. Commonwealth

APPEAL FROM SCOTT CIRCUIT COURT.

CALEB POWERS WAS CONVICTED OF MURDER AND APPEALS. REVERSED.

CRIMINAL LAW—PARDON—JUDICIAL NOTICE—DE FACTO OFFICERS—CONTESTED ELECTION FOR GOVERNOR—FINALITY OF JUDGMENT OF LEGISLATURE—INDICTMENT—CONSPIRACY—DECLARATIONS OF CO-CONSPIRATORS—RIGHT OF WITNESS TO EXPLAIN CONTRADICTORY STATEMENTS—RIGHT TO PROVE WHOLE OF TRANSACTION—INSTRUCTIONS TO JURY—AMENDMENT OF INSTRUCTION DURING ARGUMENT—LIABILITY OF DEFENDANT FOR ACTS OF CO-CONSPIRATORS NOT CONTEMPLATED—PREJUDICIAL ERRORS—CORROBORATION OF ACCOMPLICE.

Held: 1. The production of a valid pardon of the offense whereof defendant is accused puts an end to the proceedings, no plea of pardon being necessary.

Powers v. Commonwealth.

2. The court of appeals takes judicial notice of the official signature of any officer of the State, and is presumed to know judicially who is the chief executive of the State when that fact is called in question.

3. When two persons are present at the seat of government, each claiming to be governor *de jure*, and each assuming to perform the duties of the office, the one who is governor *de jure* is also governor *de facto*, especially as affecting the validity of a pardon; that being an act of the Commonwealth's grace asserted against the Commonwealth.

4. The judgment of the Legislature, in a contest for the office of Governor, was final and conclusive, and, the incumbent being adjudged not to be entitled, his powers immediately ceased, the judgment being self-executing; and therefore a pardon thereafter issued by him was void, though he retained possession of the executive building, archives, and records, the person adjudged to be entitled being also at the seat of government, assuming to perform the duties of the office, and being therefore governor, both *de jure* and *de facto*.

5. An indictment for the crime of being accessory before the fact to the murder of G., which notified defendant that he was charged with conspiracy to procure the murder of G., that he procured the murder, and that the murder was done by some one who was by him counseled and procured to do the act, is good, though a particular word or phrase of the indictment may be ambiguous or obscure; there being no doubt as to the charge intended.

6. Upon the trial of accused under such an indictment, it appearing that deceased was a State Senator, who had been a candidate for Governor, and was contesting before the Legislature, then in session, the election of one, who held the certificate of election, and was performing the duties of the office, and with whom it was charged that accused had conspired to procure the murder of deceased, it was not error to permit a witness to state a conversation with an unknown person who made threats of violence concerning the Legislature, the witness testifying that he subsequently saw the unknown person in the uniform of a sergeant among the guards in charge of the capitol square, as considerable latitude must be allowed, where a conspiracy is charged, in the admission of testimony tending to show that acts apparently isolated have sprung from a common object.

7. It was error to permit a witness to testify as to a conversation between two unknown men, in no wise identified as members

Powers v. Commonwealth.

of any conspiracy, or connected in any manner with those alleged as co-conspirators with accused.

8. Testimony of a witness as to certain telegrams which tended to show that they were written and sent before the killing was admissible.

9. Testimony to the effect that an accomplice who had testified for the prosecution had said that some one—possibly meaning one of the counsel for prosecution—could take the $100,000 which had been appropriated by the Legislature for the conviction of the murderer or murderers, "and convict Jesus Christ and the twelve apostles," was properly rejected, as it did not authorize the inference that the accomplice had been bribed.

10. Upon the cross-examination of a witness with a view to his impeachment by contradiction, he should be permitted to explain the supposed contradictory statements which he made.

11. Declarations of one whom the evidence tended to connect with the conspiracy charged, to the effect that the killing of deceased had been determined upon, and pardons prepared for the perpetrators, were admissible.

12. There having been a meeting in front of the capitol several days before the killing, at which speeches were made and resolutions adopted, declarations of members of this meeting, indicating violent and improper intentions, were admissible, as part of the *res gestae*, to show the existence of the conspiracy charged; but, the Commonwealth having been permitted to prove part of what was done there, defendant was entitled to prove all that was done, and so should have been permitted to show the resolutions adopted.

13. The words, "if the jury believe from the evidence beyond a reasonable doubt," being used in the beginning of an instruction, need not be repeated, as they would naturally be understood as applying to every one of the ingredients detailed therein as constituting guilt of the offense charged.

14. Though accused was charged only as an accessory before the fact, the giving of an instruction authorizing the jury to find him guilty, "whether he was present at the shooting or wounding or not," was harmless error, as the jury could not have found him guilty as a principal, all the evidence showing that he was not present at the time of the shooting.

15. To an instruction directing the jury to find defendant guilty if they believed deceased was killed pursuant to defendant's advice, counsel, or encouragement," the words, "and said killing was induced thereby," or their equivalent, should be added.

16. If, without any conspiracy, accused advised and counseled the killing of members of the Legislature, and in pursuance of

such advice and counsel, and induced thereby, the killing of deceased was done, the accused was guilty of murder; and the requirement that the jury should first believe there was a conspiracy to bring armed men to the capital for the purpose of doing an unlawful or criminal act before they could convict because of such counsel and advice is objectionable as tending to confuse the jury, whether or not it is reversible error.

17. It was not improper for the court to amend an instruction after four of the five arguments on each side had been made to the jury.

18. Where one of several persons who have conspired to do some other unlawful act commits a murder, his co-conspirators are not criminally responsible as accessories before the fact, unless the murder was committed in furtherance of the conspiracy, and was the necessary or probable result of its execution.

19. Where a body of armed men was brought to the State capital pursuant to a combination or conspiracy between defendants and others, and this was followed by the murder of a State senator who had been a candidate for Governor, and was then contesting the election before the Legislature, upon the trial of defendant as an accessory before the fact to the murder it was prejudicial error to instruct the jury to find the defendant guilty if they believed he conspired with others to do some unlawful act, and that in pursuance of such conspiracy, or in furtherance thereof, some one of defendant's co-conspirators, or some person acting with them, did kill deceased, though the jury may believe that such was not the original purpose of the conspiracy; as there was evidence tending to show that the sole purpose of assembling the armed men was to intimidate the Legislature, and, if such was the fact, defendant is not guilty, unless the killing of deceased was in furtherance of the conspiracy, or necessarily or probably would result from its execution, and therefore the error in failing to thus qualify, the instruction was prejudicial.

20. An error in failing to submit to the jury a certain view of the case by an instruction given can not be said to be harmless upon the ground that the testimony tending to support that view is not credible, the jurors being the sole judges of the weight of the evidence.

21. Where several accomplices had testified, it was prejudicial error to instruct the jury that they could not convict upon the uncorroborated testimony of "an accomplice," as the court should instead have used the words, "an accomplice or accomplices."

CHIEF JUSTICE PAYNTER and JUDGES WHITE and HOBSON, DISSENTING.

GEO. DENNY AND J. B. FINNELL, ATTORNEYS FOR APPELLANT (JOHN YOUNG BROWN, W. C. OWENS, R. C. KINKEAD AND JAS. C. SIMS OF COUNSEL.)

1. If the pardon which defendant plead on the calling of the case for trial is valid, his motion to dismiss the indictment should have been sustained.

The plea set out the fact that W. S. Taylor, who issued the pardon, was *de facto* and acting Governor when it was issued. There was no denial either verbal or written of this statement in the circuit court, but the court overruled the motion nevertheless.

The statement of the plea not being questioned, there was no evidence introduced to show the facts that W. S. Taylor was *de facto* and acting Governor on the 10th of March, 1890, when the pardon was issued, but this court, as well as the circuit court, will take judicial cognizance of the fact that Mr. Taylor received from the constituted authorities a certificate of election to the office of Governor, was duly inaugurated and took possession of the rooms set apart for the use of the Governor in the discharge of his official duties, retained possession of those rooms and all the property, records, &c., belonging to the office and performed its duties continually from that date until the surrender of the office after the final adjudication as to the result of the election in the supreme court of the United States, which extended beyond the date and issuance of the pardon.

AUTHORITIES AS TO WHETHER TAYLOR WAS GOVERNOR ON MARCH 10, 1900.

State v. Supreme Court, 17 Wash., 12; also find in Am. St. Rep., vol. 61, p. 893; State v. Taylor, 108 N. C., 196; 25 Am. St. Rep., 51; Peter Silea, 119 Mass., 465 (20 Am. St. Rep., 337); Leach v. Cassidy, 23 Md., 449; State v. Johns, 19 Ind., 358; State v. Durkee, 12 Kan., 314; Braidy v. Therett, 17 Kan., 471; 3 Am. St. Rep., 181; State v. Carroll, 9 Am. St. Rep., 412; 32 Am. St. Rep., 239; 139 Ill., 658; Weatherford v. The States, 37 Am. St. Rep., 829; Cooley's Con. Lim., 5th ed., 750; Smith v. Counselor, 83 Ky., 372; Stine v. Berry, 96 Ky., 67; Creighton v. Com., 83 Ky., 147; Field v. The People, 3 Ill., 79 and 80; Atty. Genl. v. Brown, 1 Wis., 513; 1 Ark., 570 (33 Am. Dec., 346); Marbury v. Madison, 1 Cranch, U. S., 137; State v. Barber, 53 Com., 76 (Am. St. Rep., 65); 1 Wis., 513.

2. If W. S. Taylor was *de facto* Governor on the 10th of March, 1900, a proposition about which there can be no doubt, in the light of

all the authorities referred to, then his official acts to that date are valid and binding on the public and can, when exercised on behalf of any citizen, be invoked by that citizen for his protection.

### AUTHORITIES AS TO VALIDITY OF THE PARDON.

48 L. R. A., 412; 15 Neb., 512; 27 Am. St. Rep., 438; State v. Gray, 23 Neb., 365; Morton v. Lee, 28 Kan., 286; Norton v. Shelby, 118 U. S., 445; Carte v. Rhener, 27 Minn., 292; Leech v. People, 122 Ill., 420; People v. Bang's 24 Ill., 184; Trumbo v. People, 75 Ill., 561; Magnan v. City of Tremont, 27 Am. St. Rep., 438; Cooley's Con. Lim., 5th ed., 751; Morgan v. Vance, 4 Bush, 324; Creighton v. Com., 83 Ky., 149; Stine v. Berry, 96 Ky., 676; Patterson v. Miller, 2 Met., 496; 17 Am. & Eng. Ency. of Law, 330 1st ed.; 8 S. C., 495, *ex parte* Smith.

3. All the instructions asked by the Commonwealth and by the defendant were refused and the court prepared and gave all the instructions to the jury. In such case the court should have instructed the jury on the whole law of the case, including the propositions suggested by the instructions asked by the defendant. This the court did not do and gave no instruction whatever upon a single proposition of law suggested by the defendant.

Instruction "B," No. 2, asked by the defendant is in these words, viz.: "The evidence of an accomplice in this case 's not sufficient to convict unless the same is corroborated by other evidence tending to show the commission of the offense and connecting the defendant therewith, and the evidence of one accomplice or co-conspirator does not and can not corroborate another accomplice or conspirator."

Instruction "D," No. 4, asked by defendant is in these words: "The defendant can not be held criminally responsible for bringing or aiding others in bringing armed or unarmed men to Frankfort unless they were brought there in furtherance of the conspiracy to kill Wm. Goebel, or bring about his death, and unless the jury believe from the evidence beyond a reasonable doubt that the bringing of armed men to Frankfort was in pursuance of a conspiracy entered into by the defendant with others to kill and murder Wm. Goebel, and for that purpose, you must find him not guilty." This should have been given.

Instruction "E," No. 5, asked by defendant is in these words: "Even though the jury may believe from the evidence beyond a reasonable doubt that defendant conspired with others named in the indictment to bring armed men to Frankfort, for the purpose of bringing about the death of Wm. Goebel, yet, unless

you shall further believe from the evidence beyond a reasonable doubt that the said Goebel was killed by some one so brought there and in furtherance of said conspiracy you will find the defendant not guilty."

Instruction No. 6, "F," is in these words: "The law presumes the defendant to be innocent of the charge against him until every fact essential to his guilt has been proven beyond a reasonable doubt, and it is your duty if you can reasonably do so, to reconcile all the facts and circumstances proven in the case, with that presumption, and if upon the whole case you have a reasonable doubt of his guilt having been proven, you must find him not guilty."

Instruction No. 7, "G," asked by defendant is as follows: "Although the jury may believe from the evidence, beyond a reasonable doubt, that some one of those charged in the indictment, as principal, fired the shot that killed Wm. Goebel, yet if you further believe from the evidence that the person so firing the shot did so of his own malice and volition, and not in pursuance of a conspiracy entered into by defendant with him for that purpose, or if you have a reasonable doubt on this point you must acquit the defendant." How the court could refuse this instruction is a matter of wonder.

Instruction No. 9, "I," is as follows: The defendant being indicted as an accessory before the fact to the killing of Wm. Goebel, you can not find him guilty as such, unless you believe from the evidence that the person who did the killing has been identified and his guilt proven beyond a reasonable doubt, and that the defendant conspired with such person to do the act."

Instruction "J," No. 10, is as follows: "The jury is instructed that they can not find the defendant guilty upon the testimony alone of an accomplice or accomplices, but the testimony of such accomplice or accomplices must be corroborated by other evidence, and every fact material to defendant's guilt proved by such accomplice or accomplices, must be corroborated by other evidence in order to the conviction of the defendant upon such testimony, and the mere killing of Goebel and the circumstances thereof is not corroborative of such accomplice or accomplices."

Instruction No. 11, "K," is as follows: "Although the jury may believe from the evidence beyond a reasonable doubt that the defendant with others took armed men to Frankfort for any unlawful purpose, yet if the jury further believe from the evidence that such unlawful purpose was afterwards abandoned, or that Wm. Goebel was not killed in pursuance of such unlawful purpose, if they believe from the evidence there was such unlawful purpose, then the jury must find the defendant not guilty.

AUTHORITIES ON INSTRUCTIONS.

Mulligan v. Commonwealth, 84 Ky., 224; Tully v. Commonwealth, 11 Bush., 158; Bishop's Crim. Procedure, vol. 2, p. 3; Rex v. Borthrick, 1 Douglas, 207.

(No other briefs for defendant in the record.)

ROBT. J. BRECKINRIDGE, ATTORNEY-GENERAL, B. B. FRANKLIN. COMMONWEALTH'S ATTORNEY, T. C. CAMPBELL AND JOS. L. MEYER, ATTORNEYS FOR COMMONWEALTH.

The indictment in this case charged that Caleb Powers . . . unlawfully, wilfully, feloniously, and of his malice aforethought and with intent to bring about the death and procure the death of Wm. Goebel, did conspire with W. H. Culton, F. W. Golden, Green Golden, John L. Powers, John Davis, Charles Finley, W. S. Taylor, Henry Youtsey, James Howard, Berry Howard, Harlan Whittaker, Richard Combs, and others, to the grand jury unknown, and did counsel, advise, encourage and procure Henry Youtsey and others, (naming them), unlawfully, wilfully, feloniously and of their malice, aforethought, to kill and murder Mr. Goebel, &c.

The indictment was found in Franklin county, but on motion of appellant, was moved by change of venue to the Scott Circuit Court, and the trial was begun July 9, 1900.

We agree with the statement of the defendant's brief that an indictment must contain a statement of the acts constituting the offense in ordinary and concise language, and we submit that the Commonwealth's Attorney in framing the indictment against the defendant complied with this requirement. What are the acts constituting the offense? It is the act of Caleb Powers conspiring with W. H. Culton, and others, it is the act of Caleb Powers in advising and procuring Henry Youtsey, and others to feloniously and of their malice aforethought to kill Wm. Goebel. It is not necessary to charge that the killing was done in pursuance of and in furtherance of the conspiracy, that is a matter of proof and not pleading. Indeed, the killing may not be in pursuance of the original conspiracy, the conspiracy in the beginning may only have contemplated an assault, a robbery, an arson, or trespass. The originator of a conspiracy may have especially prohibited violence, may have directly commanded his co-conspirators not to take life, and yet if death resulted from the trespass, the felonious purpose, the conspirators will be guilty of murder as principals or accessories, independent of whether or not they were present in person or absent after having advised or directed.

## AN ACCOMPLICE.

The law was correctly given to the jury by the court below as to the evidence of an accomplice. We submit in this connection that the record will show that Robert Noaks was not an accomplice.

## AS TO THE PARDON.

We have carefully read the well written brief of Judge Geo. Denny and James B. Finnell—Who was Governor of Kentucky, March 10, 1900, the day Powers received the pardon from Taylor?

Taylor was inaugurated Governor on December 12, 1899, and took possession of the offices in the Executive building, and also the Executive mansion. Goebel contested the election held November 7, 1899, and served notice of contest on Taylor, December 12, 1899. The contest proceeded in accordance with the law and on January 31, 1900, the Senate and House of Representatives of the State of Kentucky, in joint Assembly, decided on the evidence submitted to the two houses, that Wm. Goebel and not W. S. Taylor was the duly elected Governor of Kentucky at the election held November 7, 1899, and further found J. C. W. Beckham and not John Marshall was the duly elected Lieutenant Governor of said State. Wm. Goebel was sworn in as Governor in pursuance of said finding, on January 31, 1900, and died February 3, 1900, and was succeeded in his office of Governor by J. C. W. Beckham, the Lieutenant-Governor on said day, February 3, 1900. Taylor made application to Judge Field, Judge of the Jefferson Circuit Court, for a hearing of his case, and Judge Field decided that the decision of the Kentucky Legislature upon the question of a contested election was wholly within its jurisdiction, and the courts of the State could not interfere. This decision was affirmed by the Court of Appeals of Kentucky and by the Supreme Court of the United States, thus determining that the title of Beckham as the successor of Goebel was good, and that, first, Goebel and then Beckham were respectively *de jure* Governors of Kentucky.

Was Taylor a Governor *de facto?* It is a well settled principle that there can not be two persons or two executives at the same time and place, exercising the authority of a sovereign or ruler. In other words there can not be a *de facto* and a *de jure* executive at one and the same time.

State of Nevada, *ex re* v. Blossom, 19 Nev., 312; Williams v. Boynton, 147 N. Y., 426; People v. Tieman, 30 Barb., 193; 5 Waddell, 231; Kottman v. Ayer, 3 Strob., S. C., 94; State v. Mayer, 44 Atl. Rep., 709; State v. Carroll, 38 Conn., 449; Mont-

gomery v. O'Dell, 67 Hun., 169; Murphy v. Moies, 25 Atl. Rep., 977. So the pardon tendered by defendant signed by W. S. Taylor, and attested by defendant, Caleb Powers, as Secretary of State, was invalid, and afforded him no protection whatever.

## INSTRUCTIONS.

Some complaint has been made as to the instructions of the lower court or at least as to some of them. We regard them as a whole as a proper presentation of the law of the case and here give them in full.

*First.* The court instructs the jury that a criminal conspiracy is a corrupt combination of two or more persons by concerted action to do an unlawful act or to do a lawful act by unlawful means.

The court further instructs the jury that an accessory before the fact is one who, being absent at the time the act is committed, procures, aids, counsels, commands, advises or abets another to commit, and may be taken, tried and convicted, although the person who committed the act is never identified, apprehended or tried.

*Second.* If the jury believe from the evidence, beyond a reasonable doubt, that the defendant, Caleb Powers, did in Franklin county, and before the finding of the indictment herein, unlawfully and feloniously and with malice aforethought and with intent to bring about or to procure the death of William Goebel, conspire with W. H. Culton, F. W. Golden, Green Golden, John L. Powers, John Davis, Charles Finley, W. S. Taylor, Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, or any one or more of them, or other person or persons unknown to the jury and acting with them or either of them; and did advise, counsel, encourage, aid or procure Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, or any of them, or any unknown person or persons acting with them, or either of them, to unlawfully, wilfully, feloniously and with malice aforethought, shoot and kill William Goebel, and that in pursuance of said conspiracy and in pursuance to counsel, advice, encouragement, aid or procurement, so as aforesaid given by the defendant, the said Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, or other person or persons unknown to the jury, acting with them or either or any of them, did shoot and wound the said William Goebel with a gun or pistol loaded with powder and leaden ball or other hard substance, and from which shooting and wounding the said William Goebel did then and there within a year and a day die, they ought to find the de-

fendant guilty of murder and fix his punishment at death or confinement in the State penitentiary for life in their discretion.

*Third.* If the jury believe from the evidence, beyond a reasonable doubt, that the defendant, Caleb Powers, conspired with, aided, abetted, counseled or advised W. H. Culton, F. W. Golden, Green Golden, John L. Powers, John Davis, Charles Finley, W. S. Taylor, Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, or either or any of them, or some unknown person or persons acting with them or either of, them to kill and murder William Goebel, and in pursuance of such conspiracy and in furtherance thereof, the said William Goebel was killed by Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, or either or any of them, or by some unknown person or persons acting with them as a member or members of such conspiracy, by shooting said William Goebel with a gun or pistol loaded with a leaden or steel ball, or other hard substance, and from which shooting and wounding the said Goebel then and there did within a year and a day die, they ought to find the said Caleb Powers guilty, whether he was present at the time of the shooting or wounding or not, or whether the identity of the person so shooting and wounding the said William Goebel be established or not; and if the jury shall find the defendant guilty, they ought to fix his punishment as indicated in instruction No. 2.

*Fourth.* If the jury believe from the evidence beyond a reasonable doubt that the defendant, Caleb Powers, conspired with W. H. Culton, F. W. Golden, Green Golden, John L. Powers, John Davis, James Howard, Berry Howard, Charles Finley, W. S. Taylor, Harlan Whittaker, Richard Combs, Henry Youtsey, or either or any of them, or other person or persons unknown to the jury, acting with them, to bring a number of armed men to Frankfort for the purpose of doing an unlawful or criminal act, and, in pursuance of such conspiracy, defendant did advise, counsel or encourage the killing of any member of the Legislature, said William Goebel being a member thereof, and said Goebel was killed in pursuance of such advice, counsel or encouragement, then the defendant is guilty of murder, whether the person who perpetrated the act which resulted in the death of William Goebel has been identified or not, and if the killing of said William Goebel was committed in pursuance of such advice, counsel or encouragement, and was induced and brought about thereby, it does not matter what change, if any, was made by the conspirators, if any was made, to their original designs or intentions or the manner of accomplishing the unlawful purpose of the conspiracy.

*Fifth.* If the jury believe from the evidence beyond reason-
,able doubt that there was in existence in the county of Franklin,
and State of Kentucky, a conspiracy to kill and murder William
Goebel, as set forth in the indictment, and that the defendant,
Caleb Powers, was a party to said conspiracy, and that William
Goebel was killed by one of the persons named in the indictment,
to-wit: W. H. Culton, F. W. Golden, Green Golden, John L. Pow-
ers, John Davis, Charles Finley, W. S. Taylor, Henry Youtsey,
James Howard, Berry Howard, Harlan Whitaker, Richard
Combs, or by any person or persons unknown, acting with the
defendant and in the manner as set forth in the indictment,
and the shot was fired which brought about his death in fur-
therance of such conspiracy, all persons who were members of
such conspiracy at the time were guilty of murder; and if the
jury further believe from the evidence beyond a reasonable
doubt that the defendant, Caleb Powers, was a member of such
conspiracy at the time, they ought to find him guilty, although
the jury may believe from the evidence that at the time of the
shooting, wounding and killing of William Goebel the said Pow-
ers was not present and the time of the killing of said Goebel
had not been definitely fixed and agreed upon by the conspira-
tors, if there was a conspiracy to kill said Goebel.

*Sixth.* If the jury believe from the evidence beyond a rea-
sonable doubt that a conspiracy was formed between the defend-
ant and W. H. Culton, F. W. Golden, Green Golden, John L.
Powers, John Davis, Charles Finley, W. S. Taylor, Henry Yout-
sey, James Howard, Berry Howard, Harlan Whitaker, or either
or any of them, or with others to the jury unknown, acting in
concert with them, or either of them, to kill William Goebel,
after the formation of such conspiracy, if any, every act and
declaration of each of the conspirators done or said in further-
ance of the common designs before the consummation thereof,
became the act or declaration of all engaged in the conspiracy.

*Seventh.* The court instructs the jury that if they believe
from the evidence beyond a reasonable doubt that the defendant,
Caleb Powers, conspired with W. H. Culton, F. W. Golden, Green
Golden, John L. Powers, John Davis, Charles Finley, W. S.
Taylor, Henry Youtsey, James Howard, Berry Howard, Har-
lan Whitaker, Richard Combs, or any one or more of them,
or with some other person or persons unknown to the jury, act-
ing with them or either of them, to do some unlawful act to
alarm, to excite terror and to inflict bodily harm, and that in
pursuance of such conspiracy or in furtherance thereof, the said
Henry Youtsey, James Howard, Berry Howard, Harlan Whit-
aker, Richard Combs, or some one of them, or some other per-

son unknown to the jury, acting with them, or with those who
conspired with the defendant, if any such conspiracy there was
to do the unlawful act, did shoot and kill William Goebel, the
defendant is guilty, although the jury may believe from the evi-
dence that the original purpose was not to procure or bring
about the death of William Goebel, but was for some other un-
lawful and criminal purpose.

*Eighth.* The jury can not convict the defendant upon the tes-
timony of an accomplice unless such testimony be corroborated
by other evidence tending to connect the defendant with the
commission of the offense; and the corroboration is not suffi-
cient if it merely shows that the offense was committed and the
circumstance thereof.

*Ninth.* Every fact and circumstance necessary to constitute
the guilt of the defendant ought to be proved to the satisfaction
of the jury beyond a reasonable doubt; and unless the defendant
has been so proved guilty beyond a reasonable doubt, the jury
ought to find him not guilty.

We have quoted at length in this brief from the evidence,
and feel that the defendant has been proven guilty, as charged,
beyond all reasonable doubt, and on the whole case the judgment
should be affirmed.

OPINION OF THE COURT BY JUDGE DuRELLE—REVERSING, FOLLOWED
BY THE DISSENTING OPINION OF JUDGE WHITE, IN WHICH CHIEF
JUSTICE PAYNTER, AND JUDGE HOBSON CONCUR.

This appeal is from a judgment of conviction in the
Scott Circuit Court, to which the case was transferred
by change of venue from Franklin county, upon an in-
dictment charging appellant as accessory before the fact
to the murder of William Goebel. The indictment charges
the murder to have been the result of conspiracy between
appellant and others, and is as follows: "The grand jury
of the county of Franklin. in the name and by the author-
ity of the Commonwealth of Kentucky, accuse Caleb
Powers of the crime of being accessory before the fact
to the willful murder of William Goebel, committed as
follows, viz.: The said Caleb Powers in the said county
of Franklin, on the 30th of January; A. D. 1900, and before

the finding of this indictment, unlawfully, willfully, feloniously, and of his malice aforethought, and with intent to bring about the death and procure the murder of William Goebel, did conspire with W. H. Culton, F. W. Golden, Green Golden, John L. Powers, John Davis, Charles Finley, W. S. Taylor, Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, and others to this grand jury unknown, and did counsel, advise, encourage, aid, and procure Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, and other persons to this grand jury unknown, unlawfully, willfully, feloniously, and of their malice aforethought, to kill and murder William Goebel, which one of the last five above-named persons, or another person acting with them, but who is to this grand jury unknown, so as aforesaid then and there, thereunto by the said Caleb Powers before the fact counseled, advised, encouraged, aided, and procured, did, by shooting and wounding the said Goebel with a gun or pistol loaded with powder and other explosives and leaden and steel ball and other hard substances, and from which said shooting and wounding the said Goebel died on the third (3d) day of February, 1900, but which of said last above-mentioned persons, so as aforesaid, actually fired the shot that killed the said Goebel is to this grand jury unknown; against the peace and dignity of the Commonwealth of Kentucky."

In the discussion of the questions involved, we shall state such facts only as are necessary to a correct understanding of the questions considered and decided, and those facts will be stated in connection with the questions to which they relate.

On the trial a pardon was produced, purporting to have been issued by W. S. Taylor, as Governor of Kentucky,

dated March 10, 1900. The production of this paper was accompanied by filing what is termed in the record a "plea of pardon." As we understand the law, no plea was necessary. The simple production of a valid pardon of the offense whereof appellant was charged would put an end to the proceedings, and render void any proceeding thereafter taken in the trial.

In order to decide the validity of the paper produced as a pardon, we must consider the situation at the time it was issued. This court takes judicial notice of the official signature of any officer of this State (Kentucky Statutes, section 1625), and is presumed to know judicially who is the executive of the State at any time the fact is called in question (Dewees v. Colorado Co., 32 Tex., 570). See, also, 12 Am. & Eng. Enc. Law, p. 152, and notes. It is conceded by counsel upon both sides that the court can take judicial cognizance of the facts necessary to the decision of this question.

On January 30, 1900, William Goebel, a member of the Kentucky Senate, was shot by an assassin in the State-house yard, in front of the capitol building, at Frankfort, and died some days later. This occurred during a period of political excitement and bitterness perhaps unexampled in the history of the Commonwealth. William Goebel, William S. Taylor, and John Young Brown had been candidates for the office of Governor of Kentucky at the preceding November election. The State board of election commissioners, elected under the act of March 11, 1898, examined and canvassed the returns of election, and issued a certificate of election to W. S. Taylor. This gave a *prima facie* title to the office to Taylor, who accordingly was duly inaugurated as Governor, took the oath of office, and took possession of the State building, and the

archives and records appertaining to the office. This did not give him an absolute, indefeasible title to the office of Governor, but his title was subject to be defeated by the determination of a contest for the office. State v. Superior Court of Snohomish Co., 17 Wash., 12, (48 Pac. 741), (61 Am. St. Rep., 893). Until the certificate was set aside in some appropriate proceeding, he was entitled to re-tain possession and perform the duties of the office without interference. If the time should pass within which such proceeding might be instituted, that title became absolute and indefeasible. A contest was instituted by Goebel be-fore the Legislature, and was pending at the time of the murder, as were also contests before the State board of contest for the minor State offices, certificates of election to which had been issued to the candidates upon the same ticket with Taylor. After the shooting, the militia was called out by Taylor, and the Legislature prevented from meeting in the State capitol, and at certain other places at which they attempted to hold meetings. The records of the Legislature show, however, that a meeting was held, at which it was determined by the Legislature that William Goebel, and not William S. Taylor, had been elected Governor of Kentucky, and that J. C. W. Beckham, and not John Marshall, had been elected Lieutenant Gov-ernor. After Goebel's death, Taylor retained possession of the executive building, archives, and records, and contin-ued to act as Governor. Beckham opened an office in the Capital Hotel, a few blocks away from the capitol, which was called the "Governor's Office," and he also acted as Governor. There were thus two persons present at the seat of government, each claiming to be Governor de jure, and each assuming to perform the duties of the office.

Only one of them could, by any possibility, be Governor
*de jure*, and only one of them could be Governor *de facto*.
State v. Blossom, 19 Nev., 312, (10 Pac., 430). The legal
doctrine as to *de facto* officers rests upon the principle
of protection to the interests of the public and third par-
ties, and not upon the rights of rival claimants. The law
validates the acts of *de facto* officers as to the public and
third persons upon the ground that, though not officers
*de jure*, they are in fact officers whose acts public policy
requires should be considered valid. Oliver v. City of
Jersey City.(N. J. Err. & App.) 44 Atl., 709, (48 L. R. A.,
412). So, when both are acting officially, that one who has
the title *de jure* is both *de jure* and *de facto* officer. Es-
pecially must this be so when the act whose validity is
questioned is not an act affecting the rights of third par-
ties, but is an act of the Commonwealth's grace asserted
against the Commonwealth. So the question is narrowed
to an inquiry as to who was *de jure* Governor on March
10, 1900. The Legislature record shows that the General
Assembly determined the contest. By the Goebel elec-
tion law of March 11, 1898 (Kentucky Statutes, section
1596a, subsection 11), that decision was a judgment de-
termining the title to the office. It was a self-executing
judgment: "When a new election is ordered or the incum-
bent adjudged not to be entitled, his powers shall immedi-
ately cease, and if the office is not adjudged to another
it shall be deemed to be vacant." If this judgment of the
Legislature was valid and final, it settles the question.
In an opinion of this court, from which the writer of this
opinion dissented emphatically, and in the views of which
dissent Judge O'Rear concurs, in the case of Taylor v. Beck-
ham, 108 Ky., 278; 21 R., 1735 (56 S. W., 177) (49 L. R. A., 258),
it was said that the judgment of the Legislature was final

and conclusive.  That decision settled the question finally, and the pardon must be adjudged invalid.  The authorities upon this question are collated more fully in the opinion of Judge White, who concurs upon this question.

The next question in logical order is as to the sufficiency of the indictment.  It has been set out in full.  It is objected that the acts constituting the offense are not stated in "ordinary and concise language," so as to enable one of "common understanding to know what is intended."  We think the objection is not well taken.  The indictment notifies the defendant that he is charged with conspiring to procure the murder of Goebel, that he procured the murder, and that the murder was done by some one who was by the defendant counseled and procured to do the act.  In attempting to parse this indictment, there is at first blush some difficulty.  The use of the word "which" in the clause, "which one of the last five above-named persons," etc., is somewhat ambiguous; but, on careful examination, it seems to be used as a relative pronoun, whose antecedent is found in the clause, "to kill and murder William Goebel."  There is, however, no trouble as to the meaning, nor do we think a person of ordinary intelligence could be misled as to the nature of the charge.  As said by the Massachusetts court in Com. v. Call, 21 Pick., 515: "The grammatical and critical objections, however ingenious and acute they may be, can not prevail.  The age has gone by when bad Latin, or even bad English, so it be sufficiently intelligible, can avail against an indictment, declaration, or plea.  The passage objected to may be somewhat obscure, but, by a reference to the context, is capable of pretty certain interpretation."  In our opinion, the indictment is sufficient.

In the grounds relied on in the motion for a new trial, it is stated that the court overruled the motion of appellant, after the regular panel of the jury was exhausted, to draw the remaining names necessary to complete the jury from the jury wheel. It is to be regretted that, in a case concerning which so much feeling existed, the simple and easy mode was not adopted which would have put beyond cavil the question of the accused having a trial by jury impartially selected. This will doubtless be done upon the succeeding trial.

We need not consider the debate between court and counsel, which is complained of in the argument, as it is not necessary to the decision of the case, and in the nature of things can not, upon a subsequent trial, occur as it did in the trial now under review.

Complaint is made that the witness Watts was permitted to state a conversation with an unknown person, who made threats of violence concerning the Legislature. It was afterwards shown by the witness, however, that he subsequently saw the unknown person, in the uniform of a sergeant, among the guards in charge of the capitol square. On the trial of offenses committed in furtherance of conspiracies, there must be considerable latitude left to the discretion of the trial court in the admission of testimony of circumstances tending to show that acts apparently isolated have sprung from a common object. As said by Judge King in Com. v. McClean, 2 Pars. Eq. Cas., 368: ' "The adequacy of the evidence, in prosecutions for a criminal conspiracy, to prove the existence of such a conspiracy, like other questions of the weight of evidence, is a question for the jury." This testimony seems to have been admissible to go to the jury for what it was worth, in support of the theory of the Commonwealth as to the

nature of the conspiracy charged. The rule as to the admission of evidence in such cases is nowhere better stated than in Carson's edition of Wright on Criminal Conspiracy (page 218). Says Mr. Carson: "The concise, yet comprehensive, statement of Mr. Archbold may be accepted as a correct epitome: 'Wherever the writings or words of any of the parties charged with, or implicated in, a conspiracy can be considered in the nature of an act done in furtherance of the common design, they are admissible in evidence, not only as against the party himself, but as proof of an act from which, *inter alia,* the jury may infer the conspiracy itself.' Wherever the writings or words of such a party amount to an admission merely of his own guilt, and can not be deemed an act done in furtherance of the common design, in that case they can be received in evidence merely as against the party, and not as evidence of the conspiracy, and in strictness ought not to be offered in evidence until after the conspiracy had been proved *aliunde;* but wherever the writings or words of such a party, not being in the nature of an act done in furtherance of the common design, merely tend to implicate others, and not to accuse himself, they ought not to be received in evidence for any purpose." Tested by this rule, the language testified to by the witness McDonald, as to a conversation between two unknown men, in no wise identified as members of any conspiracy, or connected in any manner with those alleged as the co-conspirators with appellant, is clearly incompetent.

The testimony of the witness Sinclair as to telegrams was competent. As suggested by counsel for the Commonwealth, if true it would tend to show the telegrams were written and sent before the killing.

The trial court refused to allow the witness J. C. Owens to testify as to a conversation with the accomplice—witness Wharton Golden. The question sought to bring out the fact that Golden had said that some one—possibly meaning one of the counsel for the prosecution—"could take that hundred thousand dollars and convict Jesus Christ and the twelve apostles." Evidently this conver, sation was asked for on the theory that it tended to show the witness was not impartial, and that he had an interest in the result of the case. If it did so, it was not collateral or irrelevant to the issue, and Golden having been asked in regard to it, and his answer being adverse, the defense would have the right to contradict him by other testimony for the purpose of discrediting him. Steph. Dig. Ev. art. 180; 1 Greenl. Ev., 446; Schuster v. State, 80 Wis., 107, (49 N. W., 30); 3 Best, Ev., 221. But we are unable to see that the statement sought to be proved against Golden/indicates any interest. At the most, it could indicate only that, in his opinion, witnesses could be obtained by bribery. No inference that he himself had been bribed can be drawn from the language, without violent exercise of the imagination. In our opinion, it was collateral to the issue and was properly excluded.

Some of the witnesses for the defense, upon cross-examination with a view to impeachment by contradiction, were not permitted to explain the statements they made. We are of opinion that this view of the rule is too narrow. In 3 Best, Ev., section 229, what we regard as the correct rule is thus stated as to the requirement that the witness' attention shall be called to the supposed contradiction: "The rule which prescribes this condition rests on the principle of justice to the witness. The tendency of the evidence was to impeach his veracity, and common

justice demands that before his credit is attacked he should
have an opportunity to declare whether he made such
statements to the person indicated, and to explain what
he said, and what he intended and meant in saying it."

The court refused to instruct the jury that the state-
ments of the witnesses Reed and Hazlewood as to a con-
versation with the witness Sparks should be considered
as affecting only the interest and credibility of Sparks.
These statements to which Reed and Hazlewood testified
were to the effect that the killing of Goebel had been de-
termined upon, and pardons prepared for the perpetra-
tors. Assuming that there was evidence to connect Sparks
with the conspiracy charged, these declarations, if admis-
sible, were evidence in chief. But we do not think they
were competent at all as against appellant. They were
not part of the *res gestae*, or such as tended to promote the
common object. The rule is thus stated in Mr. Carson's
edition of Wright on Criminal Conspiracies: "But if the
acts and declarations of a conspirator with the accused are
made in his absence, they are not admissible against him
to prove either the body of the crime or the existence of
the alleged conspiracy, unless they either so accompany
the execution of the common criminal intent as to become
part of the *res gestae*, or in themselves tend to promote
the common criminal object. The acts and declarations
of a conspirator, to be admissible in evidence to charge
his fellows, must have been concomitant with the princi-
pal act, and so connected with it as to constitute a part
of the *res gestae*." The cases of Clawson v. State, 14 Ohio
St., 234 and State v. Larkin, 49 N. H., 39, fully support
Mr. Carson's text, as does also the third instruction given
by the court on its own motion in Spies v. People, 122 Ill.,
1, (12 N. E., 865), (17 N. E., 898), (3 Am. St. Rep., 320): "The

acts of each defendant should be considered with the same
care and scrutiny as if he alone were on trial. If a con-
spiracy having violence and murder as its object is fully
proved, then the acts and declarations of each conspirator
in furtherance of·the conspiracy are the acts and declara-
tions of each one of the conspirators; but the declara-
tions of any conspirator before or after May 4th, which
are merely narrative as to what has been or would be
done, and not made to aid in carrying into effect the ob-
ject of the conspiracy, are only evidence against the one
who makes them." We can not conceive how these state-
ments, which were merely narrative of what had been or
would be done, could be held to be made in aid of the ob-
ject of the conspiracy charged. What is here said as to
the testimony of Reed and Hazlewood expresses the views
only of Judges Burnam, O'Rear, and the writer of this
opinion; the majority of the court being of opinion that the
evidence is competent.

On January 25, 1900, as shown by testimony for the
Commonwealth, there was a meeting in front of the cap-
itol, at which speeches were made and resolutions adopt-
ed. Testimony was introduced by the Commonwealth of
actions and statements of certain persons who were ap-
parently members of this assemblage, indicating violent
and improper intentions. This evidence, we think, was
proper, under the circumstances. But the defense was not
permitted to show what the resolutions were which were
adopted. The declarations of the members of this meet-
ing were admitted, and were admissible, on the ground
that they were acts part of the *res gestae*, and were them-
selves evidence to go to the jury to show the existence
of the conspiracy charged. If the statements of persons in
the crowd were admissible, the defense had a right to all

the statement of the crowd that could be shown, because
they occurred at the same time and place, and in the same
connection.   If the Commonwealth proved part of what
was done there, the defense might prove all that was
done; if the Commonwealth showed violent language to
have been used, the defense had the right to show that
peaceable language was also used; and, if the acts or ex-
pressions of individual members of the meeting are shown
for the purpose of showing an evil intent in all, surely the
official utterance of the body might be shown for what it
was worth, to rebut the inference that the views of the
individuals were the views of the entire body.   In 1 Rob-
erson, Ky. Cr. Law, p. 149, section 107, the rule is stated:
"The acts and declarations of the defendant and his as-
sociates may be received in evidence as well in his favor
as against him, when they are a part of the *res gestae*, or
a conversation offered by the prosecution, but not state-
ments at other times,"—referring to Cornelius v. Com.
15 B. Mon. 539.   The introduction of the Commonwealth's
testimony made the testimony for the defense admissible.

By the exceptions to the admission and rejection of tes-
timony many other questions of evidence are presented
which are not referred to in the briefs, but we think the
principles which should govern their decisions have been
sufficiently stated in this opinion, and in the opinion in
Howard v. Com. (this day decided), 110 Ky., 356; 22 R., 1845
(61 S. W., 756).

We shall next consider the instruction of the court.
There seems to be no objection to the first instruction.
The second is objected to for the reason that there is no
repetition of the phrase, "if the jury believe from the ev-
idence beyond a reasonable doubt."   This phrase, however,
at the beginning of the instruction, clearly applies to every
one of the ingredients detailed therein as constituting

guilt of the offense charged. It not only applies gram-
matically, but, we think, could not be otherwise understood
by a person of average intelligence.

It is objected to the third instruction that it permits
the jury to find appellant guilty "whether he was present
at the time of the shooting or wounding or not," and
that the jury were thereby permitted to find a verdict of
guilty upon the theory that he was present, notwithstand-
ing he is charged only as an accessory before the fact, and,
if present, would not be an accessory, but a principal, in
either the first or second degree. This objection is not
tenable, for there is no testimony tending in the slightest
degree to show that appellant was present at the time
of the shooting. On the contrary, all the testimony shows
he was elsewhere. It could, therefore, under no supposi-
tion, have prejudiced him. This part of the instruction
would have been more directly applicable to the case pre-
sented if, instead of the phrase quoted, the court had used
language similar to that used in the fifth instruction, "al-
though he was not present at the time of the shooting or
wounding."

The fourth instruction is also objected to. It is as
follows: "If the jury believe from the evidence beyond a
reasonable doubt that the defendant, Caleb Powers, con-
spired with W. H. Culton, F. W. Golden, Green Golden,
John L. Powers, John Davis, James Howard, Berry How-
ard, Charles Finley, W. S. Taylor, Harlan Whitaker, Rich-
ard Combs, Henry Youtsey, or either or any of them, or
other person or persons unknown to the jury acting with
them, to bring a number of armed men to Frankfort, for
the purpose of doing an unlawful or criminal act, in the
pursuance of such conspiracy defendant did advise, coun-
sel, or encourage the killing of members of the Legisla-

ture, said William Goebel being a member thereof, and said Goebel was killed in pursuance of such advice, counsel, or encouragement, then the defendant is guilty of murder, whether the person who perpetrated the act which resulted in the death of William Goebel be identified or not; and, if the killing of said William Goebel was committed in pursuance of such advice, counsel, or encouragement, and was induced and brought about thereby, it does not matter what change, if any, was made by the conspirators, if any was made, as to their original designs or intentions, or the manner of accomplishing the unlawful purpose of the conspiracy." This instruction seems open to the objection that, after the words, "and said Goebel was killed in pursuance of such advice, counsel, or encouragement," there should be added the words, "and said killing was induced thereby," or an equivalent expression. It is also objected that it assumes the fact to exist that Goebel was a member of the Legislature, when that was a matter to be proven.

A further objection to this instruction is that the recital of a conspiracy to bring armed men to Frankfort, for the purpose of doing an unlawful or criminal act, is unnecessary to the instruction, and it might tend to confuse the jury. If, without any conspiracy, appellant advised and counseled the killing of members of the Legislature, and in pursuance of such advice and counsel, and induced thereby, the killing of Goebel was done, he was guilty of murder, without any reference to the question whether he engaged in a conspiracy to do, or to procure the doing of, some other unlawful act. But it is not necessary to consider whether these objections amount to a reversible error.

The objections to the fifth and sixth instructions do not seem to us to be valid.

The seventh instruction is as follows: "The court instructs the jury that if they believe from the evidence beyond a reasonable doubt that the defendant Caleb Powers conspired with W. H. Culton, F. W. Golden, Green Golden, John L. Powers, John Davis, Charles Finley, W. S. Taylor, Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, or any one or more of them, or with some other person or persons unknown to the jury, acting with them, or either of them, to do some unlawful act, and that in pursuance of such conspiracy, or in furtherance thereof, the said Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, or some one of them, or some other person unknown to the jury acting with them, or with those who conspired with the defendant, if any such conspiracy there was, to do an unlawful act, did shoot and kill William Goebel, the defendant is guilty, although the jury may believe from the evidence that the original purpose was not to procure or bring about the death of William Goebel, but was for some other unlawful and criminal purpose." After the instruction had been given, and after four of the five speeches upon each side had been made to the jury, this instruction was amended as follows: "The words 'some unlawful act,' as used in this instruction, mean some act to alarm, to excite terror, or the infliction of bodily harm." We do not regard the amendment of the instruction as improper on account of the time at which it was done. If the court erred in the instruction given, it was, we think, its right and its duty to so amend it as correctly to state the law. Abundant time remained for the discussion to the jury of the amendment, and the trial court would

doubtless have further extended it upon that account if requested.

In considering the other objections to this instruction, it is necessary to examine the doctrine of the responsibility of one conspirator for the acts of his co-conspirators in furtherance of the common design, although not specifically intended by him. This doctrine, in its application to the varying facts of individual cases, is founded upon several distinct and well-recognized legal principles, not, however, always distinguished by the earlier writers; and, first, there is the common-law doctrine which transfers the evil intent of a person attempting one kind of crime to the unexcpected results produced by his acts. If a man in the commission of a wrongful act, were it only a civil trespass, committed another wrong unmeant by him, he was punishable. So, if he attempted to kill one individual, and by accident killed another, whether by striking, shooting, giving poison, or in any other way, as his intent was murder, and slaying was accomplished, he was guilty of murder. So, also, if, in the attempt to commit one variety of crime, an entirely different crime was accidentally accomplished, the malice of the intended crime was imputed to the act done, in all cases where general evil intent was a constituent of the committed act. In the application of this doctrine, a distinction was made resting upon the grade of the intended offense. If the crime intended was a felony, as at common law practically all felonies were punishable with death, either with or without benefit of clergy, the felonious intent of the intended crime was imputed to the committed act, and, if it were homicide, made it murder; for it was considered immaterial whether a man was hanged for one felony or another. If he succeeded in his original felonious design,

his intent was sufficiently evil to justify hanging. If he, by misadventure, accomplished another offense requiring general malevolence, the evil intent of the intended act, being sufficient to justify the death penalty, was imputed to the act committed. His intent, if successful, was worthy of death; the deed he did was worthy of death, if it had that intent; and so it was considered by the judges as making no difference whether the committed act was the one intended. On the other hand, if the intended act was not felonious, a resultant homicide was not murder, but manslaughter. So we find that unlawfully, but not feloniously, to shoot at the poultry of another, and thereby accidentally to kill a human being, was manslaughter; but as larceny was, at common law, a felony, if the shooting were done with intent to steal the poultry, the homicide was murder. But as with advancing civilization the savage cruelty of the ancient English common law, under which some hundreds of offenses were punished with death, became softened by statutory amendment, this doctrine, even in Great Britain, became modified. The reason for its existence, that it made no difference to the prisoner or the judges for what reason the death penalty, or its practical equivalent, was inflicted, having failed, the doctrine itself ceased to be applied with its ancient rigor; and in Reg. v. Faulkner, 19 Eng. Rep., 578, we find a case in which a sailor, who, in attempting to steal rum, accidentally set fire to the spirits, and thereby burned the ship, was held not guilty of arson. An interesting discussion of this doctrine is found in 1 Bish. New Cr. Law, c. 21.

With the adoption of the English common law in the various jurisdictions in this country, and its modification by statute, there came the question whether this doctrine

applied to statutory felonies which were not felonious
at common law. In some of the jurisdictions it was held
without qualification that it did. It may be remarked
that, in many of the earlier cases, the attempted offense
was abortion; and it may be that the moral turpitude of
this offense, not at common law a felony, had effect in de-
termining the question. It was held in a Maine case
(Smith v. State, 33 Me., 48, 54 Am. Dec., 607), and the
same doctrine was announced in a number of cases, that
the grade of the committed offense depended upon the
graduation of the attempted offense by the statute, and
not upon the common-law classification. This is also jus-
tified upon the ground that, such an attempt being done
without lawful purpose and dangerous to life, malice is im-
puted. But in that case it was held that procuring a mis-
carriage resulting in death, was manslaughter only, as
such procuring was a misdemeanor. This doctrine was
emphatically stated by Chancellor Walworth, delivering
the opinion of the New York court in People v. Enoch,
13 Wend., 159, (27 Am. Dec., 197), holding "that as often as
the Legislature creates new felonies, or raises offenses
which were only misdemeanors at the common law to the
grade of felony, a new class of murders is created by the
application of this principle to the case of killing of a hu-
man being by a person who is engaged in the perpetra-
tion of a newly-created felony. So, on the other hand,
when the Legislature abolishes an offense which at the
common law was a felony, or reduces it to the grade of a
misdemeanor only, the case of an unlawful killing, by a
person engaged in the act which was before a felony, will
no longer be considered to be murder, but manslaughter
merely."

This doctrine, manifestly, should have no application in

a jurisdiction where, as in Kentucky, every offense punish-
able by confinement in the penitentiary, no matter for how
short a term, has, by one sweeping enactment, been raised
to the grade of felony (Kentucky Statutes, section 1127),
except it be qualified by the limitation foreshadowed by
Mr. Bishop (1 Bish. New Cr. Law, section 336), "by requir-
ing the act towards the proposed crime to have a natural
tendency to produce the unintended result." This limi-
tation has been indicated in a number of cases of attempt-
ed crime which resulted in the commission of a wrong not
intended. It has, as we all see, been applied with striking
unanimity in the modern cases of conspiracy. We take
it there can be no question of its application in this State.
To illustrate: Under our statute, the removal of a cor-
ner stone is punishable by a short term in the peniten-
iiary, and is therefore a felony. If, in attempting this of-
fense, death were to result to one conspirator by his fel-
lows accidentally dropping the stone upon him, no Chris-
tian court would hesitate to apply this limitation.

This doctrine of imputed malice was a part of the com-
mon law as to conspiracy (1 Bish. New Cr. Law, section
633), though, as said by Mr. Bishop, "the books furnish
little judicial reasoning on the question." So, also, was
the doctrine that "a sane man must be presumed to con-
template and intend the necessary, natural, and probable
consequences of his own acts. 3 Greenl. Ev., sections 13,
14; Rex v. Farrington, Russ. & R., 207; Com. v. Webster,
5 Cush., 305, 52 Am. Dec., 711." 3 Best, Ev., section 286.
Underlying the whole law of conspiracy is the doctrine of
agency. As said by Mr. Bishop (1 Bish. New Cr. Law,
section 631): "Since in law an act through an agent is
the same as in person, one who procures another to do a
criminal thing incurs the same guilt as though he did it

himself. Nor is his guilt the less if the agent proceeds equally from his own desires or on his own account." It is on these principles that it is said in Whart. Cr. Law, section 220: "All those who assemble themselves together, with an intent to commit a wrongful act, the execution whereof makes probable in the nature of things a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime." This is a correct application of the principle, for the reason that "there is a general presumption in criminal matters that a person intends whatever is the natural and probable consequences of his own action." 1 Phil. Ev., 632. Besides the various groups of facts which, in the older books, are held to constitute murder under one or the other of these principles, we find classed with them a number of cases where the responsibility is really that of principal in the second degree, under the law as now administered; that is, the responsibility of one "who is present, lending his countenance, encouragement, or other mental aid, while another does the act," and who, by the ancient law, was accessory at the fact. 1 Bish. New Cr. Law, section 648. They are thus grouped because the responsibility was the same, whether the homicide was committed in the attempt to commit a felony, and was therefore murder under the doctrine of imputed malice; whether it was done by the defendant by himself or his agent, or "happened in the execution of an unlawful design, which, if not a felony, is of so desperate a character that it must ordinarily be attended with great hazard to life; and *a fortiori*, if death be one of the events within the obvious expectation of the conspirators" (Fost. Crown Law, 261; U. S. v. Ross, 1 Gall., 624, 27 Fed. Cas..

899, Fed. Cas. No. 16,196), in which case malice was imputed from the dangerous nature of the act engaged to be done; or whether it occurred with the defendant standing by and ready to help, if necessary, in which case he was accessory at the fact by the ancient law, and aider and abettor and principal in the second degree under the present practice. Illustrating this grouping of crimes, we find it stated in 1 Hale, P. C., 441 (quoting from Dr. Dalton, p. 241): "Note, also, that if divers persons come in one company to do any unlawful thing, as to kill, rob, or beat a man, or to commit a riot, or to do any other trespass, and one of them in doing thereof kill a man, this shall be adjudged murder in them all that are present of that party abetting him and consenting to the act, or ready to aid him, although they did but look on." And in 1 East, P. C., 257, it is said: "Where divers persons resolve generally to resist all opposers in the commission of any breach of the peace, and to execute it with violence, or in such a manner as naturally tends to raise tumults and affrays, as by committing a violent disseisin with great numbers, or going to beat a man, or rob a park, or standing in opposition to the sheriff's posse, they must, at their peril, abide the event of their actions." As we have indicated with regard to unintended results of intended wrongful acts done by the offender in person, the common-law doctrine of imputed felonious intent has been modified. With much greater uniformity has this doctrine been disregarded in cases of conspiracy, so that for many years the test of guilt in such cases has in no wise depended upon the doctrine of imputed felonious malice, but either upon the doctrine of aider and abettor, or upon the doctrine that the act for which the accused is to be held responsible must be, either expressly or by

Powers v. Commonwealth.

implication, within the scope of his agency, and upon the legal presumption that he intends the necessary or probable consequences of his acts, whether done by himself or through the agency of another.  In every case his will must contribute to the thing actually done.  This change has taken place in strict accord with the principles of growth which are a part of the common-law system.  The ancient doctrine in one of its applications depended upon the existence in the accused "of a depraved, wicked, and malignant spirit," which would justify the death penalty if he succeeded in his undertaking.  That spirit was supposed to exist whenever the act attempted was a felony. But such a doctrine, manifestly, can have no application to a class of offenses the commission of which does not, and can not indicate such a spirit.  And when, in many of the States of this country, we made the question of felony depend upon the place in which a brief imprisonment might be passed, and acts were made statutory felonies, which by the ancient law were not offenses at all, and were then not even considered to be morally wrong, the doctrine that felonious malice could be imputed, so as to transform incidental homicide into murder, passed away forever. The reason of the rule passing, the rule passed also; and, in place of looking to the graduation of the attempted wrong under the statutory classification, we look to that on which the ancient classification was founded,—"the depraved, wicked, and malignant spirit" which the offender actually had in his heart, or which we impute to him because we suppose him to have intended the necessary or probable consequences of that which he actually did or tried to do. This is upon the wise, just, and humane principle which has enabled the common law to adapt itself to the changing necessities of human society, and has made it, as Burke

said, "an edifice having the principles of growth within itself." The law, as declared to-day, is in exact accord with what has been said. It is so stated in the text-books and the cases.

In 1 Roberson, Ky. Cr. Law, pp. 133, 134, section 101, it is said: "No responsibility attaches, however, for acts not contemplated, and which are not within the purpose of the conspiracy, or the natural consequence of executing that purpose; and the question is for the jury whether the act done was in furtherance of the common purpose, or independent of it, and without any previous concert."

In the article on "Conspiracy," by Mr. Archibald R. Watson (6 Am. & Eng. Enc. Law, 270), the doctrine as to the responsibility of a conspirator for acts of co-conspirator is thus stated: "When individuals associate themselves in an unlawful enterprise, any act done in pursuance of the conspiracy by one of the conspirators is, in legal contemplation, the act of all. And this mutual co-equal responsibility of each conspirator for the acts of his asso ciates, done pursuant to, and in furtherance of, the common design, extends, as well, to such results as are the natural or probable consequences of such acts, even though such consequences were not specifically intended as part of the original plan. This doctrine, however, holding each conspirator liable for the acts of his associates, as well as for the consequences of such acts, is subject to the restriction indicated in the statement of the rule, namely, that it is only for such acts as are naturally or necessarily done pursuant to and in furtherance of the conspiracy, and for the natural or necessary consequences of such acts, that a co-conspirator is responsible. And it is for the jury to determine whether an act done by a member of a conspiracy is done in furtherance of the common de-

sign, as well as what are the natural and necessary con-
sequences of such acts."

In Martin v. State, 89 Ala., 115, 8 South., 23, 18 Am. St.
Rep., 91, a case of murder, it was said: "When two or
more persons enter upon an unlawful enterprise, with a
common purpose to aid, assist, advise, and encourage
each other in whatever may grow out of the enterprise
upon which they enter, each is responsible, civilly and
criminally, for everything which may consequently and
proximately result from such unlawful purpose, whether
specifically contemplated or not, and whether actually
perpetrated by all, or less than all, of the conspirators.
. . . 'It should be observed, however, that, while the
parties are responsible for consequent acts growing out of
the general design, they are not for independent acts
growing out of the particular malice of individuals.' 1
Whart. Cr. Law, section 397.   And this is the general doc-
trine on the subject.   Smith v. State, 52 Ala., 407; Jordan
v. State, 79 Ala., 9; Williams v. State, 81 Ala., 1; 1 South.,
179, 60 Am. Rep., 133; Amos v. State, 83 Ala., 1, 3 South.,
749, 3 Am. St. Rep., 682; 1 Bish. New Cr. Law, section
489."

In Gibson v. State, 89 Ala., 121 (8 South., 98), (18 Am.
St. Rep., 100), an indictment for murder, the law was thus
stated by Judge Somerville:   "There was evidence tend-
ing to show a conspiracy on the part of the defendants
to attack the deceased,—circumstances from which the
jury were authorized to infer a common design, at least,
to assault and beat him.   Each would therefore be crimin-
ally responsible for the acts of the other in prosecution
of the design for which they combined, i. e., for every-
thing done by the confederates which follows incidentally
in the execution of the common design, as one of its prob-

able and natural consequences, even though it was not in-
tended as a part of the original design or common plan.
The law on this subject is fully discussed in Williams v.
State, 81 Ala., 1, (1 South., 179), (60 Am. Rep., 133), and in
Martin v. State, 89 Ala., 115, (8 South., 23.")

In Evans v. State, 109 Ala., 22, 19 South., 535, there
seems to have been some evidence from which the jury
might have inferred a combination to do an unlawful act,
and the court said: "If several conspire to do an unlaw-
ful act, and death happens in the prosecution of the com-
mon object, they are all alike guilty of the homicide.
Each is responsible for everything done, which follows in-
cidentally in the execution of the common purpose, as one
of its probable and natural consequences, even though it
was not intended, or within the reasonable contemplation
of the parties, as a part of the original design.   Williams
v. State, 81 Ala., 1, (1 South., 179); Gibson v. State, 89 Ala.,
122, (8 South., 98); Martin v. State, 89 Ala., 115, (8 South.,
23); Tanner v. State, 92 Ala., 1, (9 South., 613); Jolly v.
State, 94 Ala, 19, (10 South., 606). The thirtieth charge was
a proper one, and should have been given." The thirtieth
charge referred to was as follows:  "(30) The court charges
the jury that if they believe from the evidence that Boman,
Crawford, and Evans went to the house of Alice Palmer
on the night the killing is said to have been done, and an
offense was committed by one of them from causes having
no connection with the common object for which they went
there, the responsibility for such offense rests solely on
the actual perpetrator of the crime, and the jury can not
find the defendant guilty simply because he happened to
be present at the time the offense was committed."

Bowers v. State, 24 Tex. App., 548, (7 S. W., 247), (5 Am.
St. Rep., 901), was a case of mayhem, the maiming being

done in the course of the execution of a conspiracy to whip. Said the court: "Upon the subject of the responsibility of a conspirator for the acts of his co-conspirators, the rule, as we deduce from the authorities, is that each conspirator is responsible for everything done by his confederates which follows incidentally in the execution of the common design, as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. In other words, the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design. 1 Whart. Cr. Law (9th Ed.) sections 214-220, 397; 1 Bish. Cr. Law (7th Ed.) sections 640, 641; Lamb v. People, 96 Ill., 73; Ruloff v. People, 45 N. Y., 213; Thompson v. State, 25 Ala., 41; Frank v. State, 27 Ala., 37; Williams v. State, 83 Ala., 16, (3 South., 616); Kirby v. State, 23 Tex. App., 13, (5 S. W., 165). . . . In the recent and celebrated case of Spies v. People, 122 Ill., 1, (12 N. E., 865), (17 N. E., 898), (3 Am. St. Rep., 320), the court said: 'Whether or not the act done by a member of a conspiracy naturally flowed from, and was done in furtherance of, the common design, are questions of fact for the jury.' We are of opinion that the court erred in not submitting the question above stated to the jury, accompanied by proper instructions explaining the rules of the law hereinbefore announced."

Com. v. Campbell, 7 Allen, 541, (83 Am. Dec., 705), was an indictment for murder, the homicide occurring during a riot growing out of the enforcement of a draft of men for the army. An instruction was asked that, whether the de-

ceased was killed by a shot from within or without the armory, all the parties unlawfully engaged in the homicide were at common law guilty, at least, of manslaughter. It was said by Bigelow, C. J.: "There can be no doubt of the general rule of law, that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it, and that, if he combines and confederates with others to accomplish an illegal purpose, he is liable, *criminaliter*, for the acts of each and all who participate with him in the execution of the unlawful design. . . . These citations, to which many others of a similar tenor might be added, show that the rule of criminal responsibility for the acts of others is subject to the reasonable limitation that the particular act of one of a party, for which his associates and confederates are to be held liable, must be shown to have been done for the furtherance or in prosecution of the common object and design for which they combine together. Without such limitation, a person might be held responsible for acts which were not the natural or necessary consequences of the enterprise or undertaking in which he was engaged, and which he could not, either in fact or in law, be deemed to have contemplated or intended. No person can be held guilty of homicide unless the act is either actually or constructively his, and it can not be his act, in either sense, unless committed by his own hand, or by some one acting in concert with him, or in furtherance of a common object or purpose. . . . The real distinction is between acts which a man does either actually or constructively, by himself or his agents or confederates, and those which were done by others acting, not in concert with him or to effect a common object, but without his knowledge or assent, either

expressed or implied. For the former, the law holds him strictly responsible, and for all their necessary and natural consequences, which he is rightfully deemed to have contemplated and intended; for the latter, he is not liable, because they are not done by himself, or by those with whom he associated, and no design to commit them, or intent to bring about the results which flow from them, can be reasonably imputed to him."

The case of Spies v. People, 122 Ill., 1, (12 N. E., 865), (17 N. E., 898), (3 Am. St. Rep., 477), which is the celebrated case of the Chicago anarchists, was much criticised at the time the decision was rendered as extending the doctrine of criminal responsibility for acts of co-conspirators beyond reasonable limits. Much of this criticism seems to have arisen from the fact that, in the opinion of the court of last resort, those instructions only were stated and discussed of which complaint was made by the accused, and little, if any, notice taken of the counter instructions given on the motion of the defendants, or by the court on its own motion, which limited, qualified, and explained the instructions asked by the prosecution. Under the Illinois practice, it seems to be the custom to give instructions asked by the prosecution, and to give counter qualifying or limiting instructions asked by the defense, and for the court to add such general instructions as it deems necessary. The instructions in this case are given at length in Sack. Instruct. Juries (2d Ed.), 707 *et seq.*, and an examination of them shows that, with respect to the acts shown in that case, they fully give the limitation which we think should have been either given in the seventh instruction now under consideration, or embodied in a separate instruction, namely, that the accused was not guilty of murder unless the killing was the necessary or

probable consequence of the act conspired to be done.
Seemingly actuated by a desire to err, if at all, upon the
safe side in a case which had excited such deep feeling,
the court in that case gave instructions that if a reason-
able doubt was raised in the minds of the jury "by the
ingenuity of counsel, upon any hypothesis reasonably con-
sistent with the evidence, that doubt is decisive in favor
of the prisoner's acquittal"; that a verdict of not guilty
meant only that the guilt had "not been demonstrated in
the precise, specific, and narrow forms prescribed by law";
that they were not to convict upon mere suspicion; that
the burden was on the prosecution, and that the presump-
tion of innocence was not a mere form. In instruction 36
the jury were told: "It will not do to guess away the
lives or liberty of the people, nor is it proper that the jury
should guess that the person who threw the bomb which
killed Degan was instigated to do the act by the pro-
curement of the defendants, or any of them. That fact
must be established beyond all reasonable doubt in the
minds of the jury, and it will not do to say that, because
the defendants may have advised violence, therefore, when
violence came, it was the result of such advice. There
must be a direct connection established, by credible tes-
timony, between the advice and the consummation of the
crime, to the satisfaction of a jury beyond a reasonable
doubt." And in instruction 37 it was said: "Therefore
the jury must be satisfied, beyond all reasonable doubt,
that the person throwing said bomb was acting as the
result of the teaching or encouragement of the defendants,
or some of them, before the defendants can be held li-
able therefor, and this you must find from the evidence."
Several other instructions were given upon this line, nota-
bly instructions 35 and 36.

There seems to be no material or substantial difference of opinion among the members of this court as to the propriety of such a limitation as we have indicated. The difference is upon the question whether the failure to give to the jury such a limitation of the doctrine was prejudicial error. To consider this question, we must refer to the contentions on behalf of the Commonwealth and the accused, as shown by the evidence. On behalf of the Commonwealth, the evidence was directed to showing that there existed a bloody-minded conspiracy, having for its object the killing of various members of the Legislature, and especially the killing of Goebel; that the accused, who held a certificate of election as Secretary of State, and whose office was in contest, was a party to this conspiracy, with full knowledge of its atrocious object, and in pursuance and furtherance thereof was instrumental in bringing armed men to the State capital to assist in its execution. On the other hand, the evidence for the defense was directed to establishing the fact that the men who were brought to Frankfort were brought for the purpose of peaceably assembling to petition the Legislature, in the exercise of the privileges guarantied to them as citizens in the bill of rights, and that such of them as bore arms bore them openly, and solely for the purpose of self-protection. Between these two extremes of object in the proof there was room for many varieties of purpose which might be ascribed to the assemblage, and there was some evidence to support almost any of the theories which might thus be constructed. There was evidence to support the theory that the assemblage was for the purpose of impressing the minds of the members of the Legislature by the physical presence of a large number of men. This might be regarded as a species of intimidation,

and need not imply the intent to do actual violence. And this view was submitted by the court to the jury, though without the necessary limitation as to its effect; for by the amendment the jury were instructed that the purpose was unlawful if it was "to alarm, to excite terror, or the infliction of bodily harm." There was undoubtedly evidence to support the theory that there was a combination; that the purpose of the assemblage was to alarm, and to do nothing else. Whether that evidence was to be believed or not was a question solely for the jury, under proper instructions. The accused had the right to have the jury pass upon the question whether that was the sole object of the assemblage, and upon the further question whether the killing of Goebel necessarily or probably would result from such an assemblage. It will not do to say that because the judges would have disregarded such evidence had they been jurors at the trial it is not prejudicial, for the jurors are the sole judges of the weight of the evidence, and to hold otherwise would be for the court to assume to perform those functions which from time immemorial have been regarded as within the sacred province of the jury.

It was said by Judge Lewis in Bowlin v. Com., 94 Ky., 395; 15 R., 149 (22 S. W., 543): "In fact, it is not the province of the lower court, any more than of this, to weigh evidence for the purpose of determining whether a person on trial for his life is entitled to an instruction as to manslaughter. But, if there is any evidence tending to show the homicide is of the degree of manslaughter, the accused is entitled to an instruction upon that hypothesis." See, also, Bush v. Com., 78 Ky., 269; Buckner v. Com., 14 Bush, 603; Brown v. Com., Id., 396.

In Gibson v. State, 89 Ala., 121, (8 South., 98), (18 Am.

Powers v. Commonwealth.

St. Rep., 101), it was said: "The testimony of the defend-
ants themselves tended to support every phase of the in-
struction requested.   It mattered not that this testimony
may have sprung from parties deeply interested, and have
been contradicted by many disinterested witnesses, so as
to be entitled to but little weight in the estimation of the
trial judge.   It was for the jury, and not the court, to
pass on the credibility of the witnesses and the sufficiency
of the evidence.   Every prisoner at the bar is entitled to
have charges given which, without being misleading, cor-
rectly state the law of his case, and are supported by any
evidence, however weak, insufficient, or doubtful in credi-
bility.   The charge under consideration was a correct
enunciation of the law, and, being supported by the evi-
dence, its refusal must operate to reverse the judgment
of conviction.   McDaniel v. State, 76 Ala., 1."

We are clearly of opinion that the instruction as given
was not only erroneous, but highly prejudicial.   This in-
struction should be qualified by requiring the jury to be-
lieve that the murder was committed in furtherance of the
conspiracy, and was the necessary or probable result of
the execution of the conspiracy.

The eighth instruction is as follows:   "The jury can not
convict the defendant upon the testimony of an accomplice
unless such testimony be corroborated by other evidence
tending to connect the defendant with the commission of
the offense, and the corroboration is not sufficient if it
merely shows that the offense was committed and the cir-
cumstances thereof."   It is objected to this instruction
that it permits the jury to find guilt from the unsupported
testimony of more than one accomplice, and instruction
No. 2 was asked by the defense in these words:   "The
evidence of an accomplice in this case is not sufficient

to convict unless the same is corroborated by other evidence tending to show the commission of the offense, and connecting the defendant therewith, and the evidence of one accomplice or co-conspirator does not and can not corroborate another accomplice or. co-conspirator." The instruction asked and refused may not be strictly. accurate in form, for it may be said that while one accomplice by his testimony does, or at least may, corroborate another, nevertheless the idea is accurate that they do not corroborate each other for the purpose of conviction, in the absence of other testimony. The jury should have been told that they could not convict the defendant upon the testimony of an accomplice or accomplices, unless such testimony be corroborated by other evidence tending to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof. In 2 Roberson, Ky. Cr. Law, p. 1076, it is said: "If two or more accomplices are produced as witnesses they are not deemed to corroborate each other." In U. S. v. Logan (C. C.) 45 Fed., 872, it was held that a conviction for a conspiracy can not be had on the uncorroborated testimony of a co-conspirator, nor can conspirators corroborate each other. See, also, 1 Greenl. Ev., section 381, and Smith v. Com. (Ky.) 17 S. W., 182. This doctrine is distinctly recognized in Blackburn v. Com., 12 Bush, 181. It is agreed that this was erroneous, but there is variance of opinion as to whether it was prejudicial. Unless we can assume to invade the province of the jury, and weigh the evidence, this instruction was necessarily prejudicial, or, at least, may have been so.. The most material testimony upon the question whether the conspiracy was to murder was that of confessed accomplices, and if the jury,

in the exercise of their prerogative, disbelieved the other evidence upon this question, they might have reached a different conclusion had they been told that they could not convict upon the uncorroborated testimony of accomplices. Our views upon this question are sufficiently stated in considering the prejudicial character of the seventh instruction.

For the reasons given, the judgment is reversed, and cause remanded, with directions to award appellant a new trial, and for further proceedings consistent herewith.

Judge White dissents.

Not agreeing with the views of the majority of the court on all the questions presented, we feel that the importance of the questions justifies us in this separate and dissenting opinion. Appellant, Caleb Powers, was indicted in the Franklin Circuit Court charged with the crime of being accessory before the fact of the willful murder of William Goebel. On change of venue, the prosecution was taken to Scott county, and there tried; the result being conviction, the punishment being confinement in the penitentiary for life. Appellant's motion for a new trial being denied, he appeals.

The indictment reads, after the caption: "The grand jury of the county of Franklin, in the name and by the authority of the Commonwealth of Kentucky, accuse, Caleb Powers of the crime of being accessory before the fact to the willful murder of William Goebel, committed as follows, viz.: The said Caleb Powers, in the said county of Franklin, on the 30th day of January, A. D. 1900, and before the finding of this indictment, unlawfully, willfully, feloniously, and of his malice aforethought, and with intent to bring about the death and procure the murder

of William Goebel, did conspire with W. H. Culton, F. W. Golden, Green Golden, John L. Powers, John Davis, Charles Finley, W. S. Taylor, Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, and other persons to this grand jury unknown, and did counsel, advise, encourage, aid, and procure Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, and others to this grand jury unknown, unlawfully, willfully, feloniously, and of their malice aforethought, to kill and murder William Goebel, which one of the last five above-named persons, or another person acting with them, but who is to this grand jury unknown, so as aforesaid then and there, thereunto by the said Caleb Powers before the fact counseled, advised, encouraged, aided, and procured, did, by shooting and wounding the said Goebel, with a gun or pistol loaded with powder and other explosives, and leaden and steel ball and other hard substances, and from which said shooting and wounding the said Goebel died on the 3d day of February, 1900, but which of said last above mentioned persons, so as aforesaid, actually fired the shot that killed the said Goebel, is to this grand jury unknown; against the peace and dignity of the Commonwealth of Kentucky.   Bobert B. Franklin, Commonwealth's Attorney, 14th Cir. Ct. Dist."

Upon arraignment, appellant filed a special plea, producing a paper purporting to be a pardon issued by W. S. Taylor, Governor, dated March 10, 1900, and asked to be discharged from custody.   The court refused to discharge appellant, thereby refusing to recognize the paper purporting to be a pardon as valid.   Appellant then demurred to the indictment, which was overruled by the court, and that action is assigned as error.   Appellant, after his special plea of pardon and his demurrer were both over-

ruled, pleaded not guilty; and trial was had, with the result as stated.

The question of the sufficiency of the indictment, going to the very foundation of the prosecution, should be first considered; for, if the objection be good, the other questions are not necessary to a consideration of the case. The charge laid in the indictment is that appellant is guilty of being accessory before the fact of the willful murder of William Goebel. The accusing part is that appellant did conspire with Culton and others named, and other persons unknown, and did counsel, advise, encourage, aid and procure Youtsey and others named, and others to the grand jury unknown, unlawfully, willfully, feloniously, and of their malice aforethought to kill and murder William Goebel, with the further charge that it was unknown what person actually did the killing. The indictment then says these acts were done, "so as aforesaid, then and there thereunto by the said Caleb Powers, before the fact counseled, advised, encouraged, aided, and procured, did by shooting," etc., kill William Goebel.

Two objections are presented to the indictment and urged as fatal. One objection is that it is not charged in terms that the killing was done in pursuance to and in furtherance of the conspiracy charged to have been entered into. The other objection is that the principal (the one who actually fired the fatal shot) is not named, but the charge is that Youtsey, etc., or another person to the grand jury unknown, did the killing. The court is agreed that neither of these objections is tenable, and is agreed that the indictment is sufficient. While the indictment does not contain the words usually found, "in pursuance to, and in furtherance of, the conspiracy," yet it does say

that appellant, Powers, did counsel, encourage, aid, and procure Youtsey, etc., willfully, feloniously, and of their malice aforethought, to kill and murder William Goebel, and then charges,"so as aforesaid then and there thereunto by the said Caleb Powers, before the fact, counseled, advised, encouraged, aided and procured, did, by shooting," etc., kill William Goebel. The charge is direct and certain that appellant is accused of counseling, aiding, encouraging, and procuring Youtsey, etc.; to commit a willful murder, and that, having been so counseled, advised, aided, and procured, they, or one of them, did commit the murder. Instead of using the words so often used, "in pursuance to, and in furtherance of," the conspiracy, the indictment charges how it was done, so that appellant would be charged as accessory before the fact if he counseled, aided, or procured the murder to be done, and the conspiracy charged failed in the proof; that is, as to the other than the actual principal.

As to the other proposition, that the principal must be named before the accessory before the fact could be convicted, the court is agreed that this point is likewise without merit. This precise question was presented in the New York Court of Appeals in People v. Mather, 4 Wend. 229, on an appeal by the prosecution. In a very exhaustive opinion, reviewing all the common-law authorities, the court held the indictment good. Again, in the case of U. S. v. Babcock, 3 Dill., 623, Fed. Cas. No. 14,487, the court held such an indictment valid. In U. S. v. Goldberg, 7 Biss., 175, Fed. Cas. No. 15,223, the indictment charged a conspiracy with certain named persons, "and other persons," the word "unknown" being omitted, yet the court held the indictment good. In the Anarchist Case (Spies v. People) 122 Ill., 1, (12 N. E., 865), (17 N. E.,

898), this question was again presented, and, after an exhaustive review of all the authorities, the court concluded the indictment was valid. This last case went to the supreme court on application for a writ of *habeas corpus*, and the indictment was held to charge a crime, and writ denied. These cases ought to settle the question beyond controversy. We are all agreed that the indictment is sufficient, and the demurrer thereto was properly over. ruled.

Counsel for appellant seriously and ably present the question that the pardon issued March 10, 1900, by W. S. Taylor to appellant, is valid and binding on the State, and that upon its production the appellant should have been discharged. The position of counsel on that point is that on the 10th day of March, 1900, W. S. Taylor was *de facto* Governor of the State, and so continued until the decision of the Supreme Court of the United States rendered May 21, 1900 (Taylor v. Beckham, 20 Sup. Ct., 890, 1009, 44 L. Ed., 1187), and that until Taylor surrendered the office, or was ousted after the mandate of the Supreme Court was issued, he was a *de facto* officer, and his acts are binding. It is said that the judgment of the circuit court and of this court was superseded, and that as a consequence J. C. W. Beckham acquired no more rights under the judgment in that case than before it was rendered; that as Taylor had been awarded the certificate of election, and had been inaugurated as Governor, he held till he was ousted by due process of law, or vacated. It is also suggested that the court will take judicial notice of the official public acts, as well as the signature of the chief executive; that the court must judicially know who is the Governor at any given time. We take it to be well settled that there can not be two *de facto* officers for the same

office, to be filled by only one person, at the same time.
If, on March 10, 1900, Taylor was *de facto* Governor, then
on the same day Beckham was not, and *vice versa*.    Coun-
sel for appellant cites in support of his position the case
of State v. Supreme Court, of March 12th, and quotes
as follows: "One in possession of an office by virtue of a
certificate of election issued by the proper officer, and reg-
ular on its face, is entitled to retain possession and per-
form the duties of the office, without interference, until
such certificate is set aside in some appropriate proced-
ure." A case in 82 Mich., 255, 46 N. W., 381, (9 L. R. A.,
408) (Hallgren v. Campbell), is also cited, where the court
said: "There could not be two incumbents of this office."
The case of Hamlin v. Kassafer, 15 Or., 456, (15 Pac., 778),
is also cited. The court there said: "An 'office' is defined
to be a right to exercise the public functions and employ-
ments, and to take the fees and emoluments, belonging
to it, and Chief Justice Marshall says: 'He who performs
the duties of that office is an officer.' From the inher-
ent nature of an office, no less than from reasons of public
policy, there can not be two persons in possesion of it at
the same time." The definition of Lord Ellenborough in
Rex v. Bedford Level Corp., 6 East, 368, is cited by counsel
to support the contention that Taylor was *de facto* Govern-
or, March 10, 1900. This definition is: "An 'officer' *de
facto*' is one who has the reputation of being the officer
he assumes to be, and yet is not a good officer in point of
law." The definition of Judge Cooley, in his work on Con-
stitutional Limitations, is also cited. It reads: "An 'of-
ficer *de facto*' is one who, by color of right, is in possession
of an office, and for the time being performs its duties,
with public acquiescence though having no right in fact."
There are many other citations to the same effect.

We do not propose to take issue with any of the authorities cited, for they seem to us to state the law clearly and correctly. The question is in the application. The court judicially knows that on the 1st day of January, 1900, the General Assembly, in pursuance to the power given it under our Constitution, decided the contest over the office of Governor in favor of the contestant, William Goebel. The court knows judicially that on that day William Goebel was inaugurated as Governor; that he afterward died, and J. C. W. Beckham became, by virtue of the law, he being Lieutenant-Governor, the acting governor from the 3d day of February, 1900. The court further knows that it was decided by this court, and its decision was sustained by the supreme court of the United States, that the courts had no jurisdiction in the matter; that the decision of the contest before the General Assembly was final and conclusive, from which there was no appeal. While W. S. Taylor executed a supersedeas bond to supersede the judgment of the circuit court, and of this court, he did not and could not supersede the judgment and decision of the General Assembly on the question as to whether he or William Goebel had been legally and duly elected Governor in November, 1899. The appropriate procedure provided by law to set aside the certificate of election issued to W. S. Taylor is a contest before the General Assembly, and when the contest was decided by that body, and the successful party took the required oaths, he became the Governor. There is no writ provided, nor is one required, to induct a successful contestant into office, or remove an unsuccessful one from office. The judgment of a motion in the contest proceeding is self-executing. This judgment was not appealable, and, therefore, could not be suspended, arrest-

ed, or superseded.  Even if the decision of contest had
been appealable to any tribunal, it is well settled by au-
thority that a supersedeas or writ of error will not prevent
the successful party in the contest from assuming the du-
ties of the office.  State v. Woodson, 128 Mo., 497, 31 S.
W., 105); People v. Stephenson, 98 Mich., 218, (57 N. W.,
115); Jayne v. Drorbaugh, 63 Iowa, 711, (7 N. W., 433);
State v. Chase, 41 Ind., 356; Elliott, App. Proc., section
392, and cases cited.

Stress is laid by the adjudicated cases on the color of
right or title to the office, and not on the claim.  In the
case of Williams v. Boynton, 147 N. Y., 426, (42 N. E., 184),
the court of appeals said of the rule as to *de facto* officers:
"It applies for the protection of third persons, or the pub-
lic who have acquired rights upon the faith of an appear-
ance of authority.  It does not apply where the official
action is challenged at the outset, and before any person
has been or can be misled by it. . . . His color of title
was wholly destroyed by a public judicial decision, and he
became a mere usurper and intruder, whose act was chal-
lenged at the moment it was done."  In the case of Oliver
v. City of Jersey City (from N. J. Court of Errors and Ap-
peals) 44 Atl., 709, cited by appellant as 48 L. R. A., 412,
the court, speaking of the acts of a *de facto* officer, said:
"But this legal protection is not afforded where the defects
in the title to the office are notorious, and such as to make
those relying on his acts chargeable with such knowledge.
What, then, may be considered notice sufficient to warn
third persons and the public?  The expiration of the term
of an officer, and the appointment or election and qualifica-
tion of his successor, the resignation of a public officer,
the abolishment of the office itself by the act of the Legis-
lature, the refusal of the board and legislative body of

which the officer is a member to recognize him, and the
judgment of a court against the title of the office, are such
facts as third persons and the public are, as a general rule,
required to take notice of."

The decision of the contest by the General Assembly
was a judgment of the only court constituted by law to de-
termine a contest over the office of Governor, and of that
decision the appellant is presumed to have had actual no-
tice, and the public generally must take notice. The color
of title that Taylor had by reason of the certificate of elec-
tion and his inauguration was wholly destroyed by the
judgment of the General Assembly when the contest was
decided against him, and thereafter, in the language of the
court of appeals of New York, "he became a mere usurper
and intruder, whose act was challenged at the moment it
was done." The supreme court of Rhode Island, in the case
of Murphy v. Moies, 25 Atl., 977, said: "Thus, it appears
that reputation and acquiescence are controlling elements
in determining the validity of official acts, as those of an
officer *de facto*." Tested by this rule, it is clear that Tay-
lor's acts on the 10th day of March, 1900, were not those
of a *de facto* officer. His acts were not accepted by the law-
making branch of the government. Prior to that day, and
on that day, the senate had repeatedly ratified and con-
firmed the appointment of various and sundry officers ap-
pointed by Governor Beckham, and both branches of the
Legislature had recognized Beckham as Governor by pre-
senting bills for his approval and signature, and he had in
fact approved three of such. There was no acquiescence in
the acts of Taylor on the 10th day of March, 1900. The
rule that acts of a *de facto* officer are binding on the public
and third persons can not apply where the defects in the
title of the assumed officer are notorious, and the persons

dealing with him have notice of the facts.    Mechem, **Pub. Off.**, 328, and cases cited.

In this case, the appellant, being Secretary of State when the contest was decided by the General Assembly, must be conclusively presumed to have had knowledge of the defects in the title of Taylor, or rather that he thereafter had no title to the office.   We think it clear, upon the plainest principles, that where a person has knowledge that one who assumes to be a public officer has, by a judgment of a competent tribunal, been adjudged not to have title to the office, such person can not claim that the acts of such intruder and usurper are those of a *de facto* officer.

During the progress of the trial, many objections to the admission of testimony and many exceptions to the exclusion of testimony were made.    Likewise objections and exceptions to instructions given and refused appear in the record, and, in order to an intelligent understanding of the case and the parts we propose to discuss here, we deem a short statement of the material facts the evidence tends to prove to be necessary.

These facts are that William Goebel was a member of the senate, and was also a contestant for the office of Governor against W. S. Taylor, contestee, the case being heard before a joint committee, as provided by law.   On the morning of January 30, 1900, after all the testimony in the contest case had been heard, while on his way to the session of the senate, and just in front of the State house, the contestant, William Goebel, was shot down, from which he died in a few days thereafter. The proof further tended to show, with reasonable clearness, that the shot was fired from a window in the private office of appellant, Caleb Powers, who was then Secretary of State.   (It had been agreed that the testimony heard before the committee on

contest for Governor should be heard and used on the trial
of the contest over the office of Secretary of State by C. B.
Hill against appellant.)   At the time of the shooting, the
window was raised a few inches, and the blinds down.   On
that morning, just prior to the shooting, appellant Powers,
together with his brother, John L. Powers, Walter Day,
and F. W. Golden, had taken the train for Louisville.   It
is shown that on January 19, 1900, the militia company of
Frankfort was secretly assembled, the members out of
town were brought in, and board engaged for them in the
city near the arsenal.   This company was stationed at the
arsenal, and given orders to be at all times in readiness to
move on orders. They were drilled daily on up till the 30th,
but in secret inside the arsenal.   There were forty-four
men in the company.   It is also shown that about this
time, probably 18th, a meeting was held, in which appel-
lant was an active participant, if not the moving spirit, for
the purpose of arranging to bring a large body of armed
men from the eastern section of the State to Frankfort
for the purpose, as appellant himself states it, of influencing
the legislative action by their presence.   These men were,
as arranged in that meeting, to be brought from Bell, Har-
lan, Clay, Laurel, Whitley, Pulaski, Rockcastle, Metcalfe,
and other counties.   They were all to be brought over the
Louisville & Nashville Railroad, and it seems, at first con-
templated, were not to have tickets or passes, but were to
climb on the train and come.   To arrange for these men,
and to have the requisite number come (there was about
1,500 contemplated), messengers were sent out to the vari-
ous counties, and appellant provided these men with mo-
ney to bring the men to the railroad stations.   At this
meeting to arrange for these men it was recognized that
the undertaking was a serious one, appellant himself cau-

tioning the persons present to secrecy, as they might all
be indicted for conspiracy. To further arrange for these
parties to come, the appellant, Powers, sent telegrams to
parties in the eastern end of the State, to meet him on im-
portant business at London, Ky. Appellant had a confer-
ence there with some parties, and made further arrange-
ments about the men coming on January 25th. There was
a third conference, at Barbourville, relative to the same
matter, by appellant with other parties, Charles Finley, F.
W. Golden, and John L. Powers being present. It was
there determined that the men should have tickets and
should come as passengers. In the town of Barbourville
there were two companies of militia. John L. Powers was
the captain of one company, and J. F. Hawn the captain of
the other. While at Barbourville, January 22, 1900, appel-
lant addressed to Adjt. Gen. Collier, a letter, as follows:
"My Dear Sir: There are two of the companies in this
end of the State that refuse to go unless they are called
out regularly. The London company, under Capt. E. Par-
ker, and the Williamsburg company, under Capt. Watkins,
of Williamsburg, are the ones. We must have these men
and guns. We are undertaking a serious matter, and win
we must. Send some one to London and Williamsburg
with such orders as will have these two companies join us
Wednesday night. Don't fail. If you will see to it, wire
me to-morrow. Golden is improving. Capt, Hawn, of one
of the companies here, refuses to deliver up the keys to the
armory. Give him such orders as will give us the key.
Wire me, and also write me. We will be there Thursday
morning with twelve hundred men or more. Arrange
board and lodging. Very sincerely, Caleb Powers." Capt.
Hawn, of the Barbourville company, had been asked to give
the key to the armory to his lieutenant, after he himself

had refused to bring his military company to Frankfort with the large crowd to come on the 25th, Thursday, and to permit the members to bring their arms, ammunition, and uniform along. All of this Capt. Hawn had declined before this letter was written by appellant. Before the large crowd was to come, appellant ordered printed badges on white ribbon, bearing the picture and autograph signature of W. S. Taylor, contestee for Governor, which were distributed to the men on the train, and worn on their coat lapels.

On the morning of January 25, 1900, between 1,000 and 1,200 armed men were brought to Frankfort, according to this prearranged plan. They filled the regular passenger train, and had an extra train following. Powers himself came on one train with part of the men. As part of this large body, there were several companies of State militia, with their officers, in citizens' clothing, but their uniform underneath, and with their arms and equipments. When this large body arrived in Frankfort, they were marched from the train to the building, where the Adjutant-General keeps his office, and their guns were checked and stacked in the office of Commissioner of Agriculture, which is next door to the Adjutant-General's office. Checks had been provided. The men kept their pistols, for the most part, but their guns, army rifles, shotguns, and such like were checked. The men were then fed from provisions that had been brought from Louisville. These men were assembled, and speeches made to them, and some resolutions adopted. On the night of the 25th, the same day they came, a large part of the men were sent home, but about 200, maybe more, picked men, were kept and remained in Frankfort, with general headquarters at the Commissioner of Agriculture office, up till after the shoot-

ing. They slept in the State buildings, and cooked and eat on the public grounds. It is shown that these men, from the 25th, the day they came, up till the very day of the shooting, were each day seen in crowds in front of the capitol building, and on the walks leading from the front gate, and on around the buildings.

On the morning that William Goebel was shot, although these men were here in the city, none were to be seen on the walks or public grounds. It is shown that within a short time of the shooting, variously estimated from ten to thirty minutes, the company of militia stationed at the arsenal were at the capitol grounds, and took possession thereof, and excluded the civil authorities. It is also shown that there were probably as many as twenty-five persons on the first floor in the executive building, from whence the shot came, at the moment it was fired; there were several persons in the Secretary's public office, adjoining the one from whence the shot came. The Governor himself, W. S. Taylor, who is accused with appellant, was within fifty feet of the assassin when the shot was fired, and heard the shot. The capitol policeman, John Davis, who is also accused, was in the public office of the Secretary of State, and heard the shot. The appointees of the Governor, Todd, private secretary, and Stone, stenographer, together with appointees of appellant in the office of Secretary of State, Davidson, Hemphill, and Matthews, and the colored porter, were also in the adjoining room to the private office. It was also proven that Youtsey, who is charged as one of the principals, bought smokeless powder and steel ball cartridges of the size and caliber of the one shown to have killed William Goebel, and that immediately after the shooting Youtsey ran down the steps into the basement of the executive building, through the barber

shop that was then there, and out and around the building, and into it again from the other side, very much excited. The top of the stairway down which Youtsey ran is within a few feet of the door into the private office of appellant. It is shown that appellant locked that door upon starting for Louisville, but that John L. Powers had the day before given Youtsey a key, and there were but two known. It also appears that, before the 30th, Youtsey had described how Goebel could be shot from the private office from the window—the identical plan afterward carried out. In describing this plan, Youtsey said it was the slickest scheme yet to settle the contest. Just before the shooting Youtsey called and stationed a body of men in the hall near the door of the private office, and near the head of the stair, down to the basement, telling them something was going to happen. Besides all these circumstances proven, there was direct evidence of two or three admitted conspirators, showing that a conspiracy was formed and its objects.

Without contradiction, even by appellant himself, it is shown that he was the leading spirit in organizing and bringing this large body of men to Frankfort, and in keeping them here, as he says, to influence the Legislature by their presence, and to resist by force of arms the legally constituted authorities in any attempt to oust Taylor or himself from office. Frequently before the shooting appellant expressed himself as being in favor of war rather than surrender the offices claimed. After the assassination, appellant wrote to a friend in Eastern Kentucky, in substance: "The disorganization of the Democratic party is due to me more than to any other person." It is also shown that appellant said that, if necessary, he would kill William Goebel to prevent him being Governor, and again he said that with Goebel dead there was no other person

who could hold the Democratic party together. Youtsey was seen in appellant's private office at the window, with a gun, and this appellant knew and saw, and was in the room with Youtsey alone, and had a conversation with him on Friday or Saturday before the killing on Tuesday, yet this conversation is not detailed by appellant, nor is its substance or subject stated. There were many other facts and circumstances proven on the trial, all tending to show that there was a conspiracy formed by appellant with others, known and unknown, for the purpose of preventing Goebel being declared Governor, and to use such force as might be deemed necessary to that end.

During the trial the prosecution introduced and had sworn Pat McDonald, who testified that on Saturday before Tuesday, January 30th, when Goebel was shot, two men came from upstairs, where the General Assembly was in session, and had just decided the contested seat of Van Meter against Berry, by which decision Berry, a political adherent and supposed friend of Taylor, had been un-seated, and Van Meter, a political adherent and supposed friend of Goebel, had been given the seat; and these two men went rapidly toward the front door of the capitol building, and one said: "Come on. Come on, boys; get your guns; it is time to begin the kill-ing." Witness could not name these two men, nor did he describe them so as to be identified. However, witness did say they went out and around to the office of the Commis-sioner of Agriculture, where the guns had been checked on Thursday before, and where was general headquarters of the 200 or more men kept here, out of the large crowd of Thursday. The opinion of the court holds the evidence to be incompetent because the parties were not identified, nor was it pretended that appellant was present and heard

the statement. We are of opinion that the evidence was competent. Proof had been introduced that tended to show that a part of the plan of the conspiracy was to raise a disturbance in the legislative hall over the Van Meter-Berry contest, and in the fight that followed the men left over from Thursday, who wore Taylor badges and were to be stationed in the gallery and lobby of the legislative hall, were to kill Democratic members of the Legislature, so that on a joint vote Taylor could be declared the Governor in the contest proceeding. We have said above there were some 200 men retained here from Thursday, and there was proof tending to show that this was a part of the plan and purpose of keeping them. Their headquarters were in the very room where these two men, whom McDonald heard and saw, went. Their guns were deposited there. The very matter had come up about which the disturbance was to be raised, and the result had been adverse to Taylor. These men are shown by McDonald not to have been citizens of Frankfort, for he lived here. We think it was sufficiently shown that these men belonged to the large number kept here, and this testimony also tended to corroborate the other testimony of the conspiracy and of the plan to kill members of the Legislature. The time, the place, the circumstances, and the fact that they proposed then to do the things that was contemplated, and they went to headquarters, so to speak, for their guns, we think sufficiently show that these two were acting in conjunction with others who are shown to have known of, and were detailed to execute, the plan of assassination in the legislative hall, to permit the proof to go to the jury. We agree with the court that this was important testimony, and we think it was properly admitted.

The appellant offered to read to the jury what purported to be the resolutions adopted at the meeting in front of the capitol on January 25th, by the large body of men, and the court refused to permit it to be read as evidence for any purpose, and the majority opinion holds this to be error. We can not assent to this proposition. We do not think these resolutions were competent evidence for any purpose. There was no attempt on the part of the prosecution to prove any action on the part of the body assembled, nor of anything said by any speaker that addressed the body. Indeed, it was not proven by the prosecution that a meeting was held at all, except as an incident to fix a time and place of a certain conversation had between two persons, Noaks and John L. Powers. Noaks details the conversation this way: "While I was leaning against the pillar, John L. Powers came to me, and tapped me on the shoulder, and said, 'Bob, keep close into the building;' and I said, 'What is the matter?' and he said, 'Some of our men are upstairs, and when Goebel and some of the rest of them fellows come in there we are going to do the work for them.'" The witness said the conversation took place in front of the capitol building, while the meeting was going on. The witness did not attempt to detail anything that was done at the meeting. On the contrary, the witness gave this as a private conversation between himself and John L. Powers, an alleged co-conspirator with appellant. We do not understand upon what principle of law or rule of evidence that this would entitle appellant to prove what the public meeting did, nor what any one of the thousand persons engaged therein said or did. Appellant was entitled to the whole of the conversation between Noaks and John L. Powers, and this the court permitted; but the rule would not extend to the admission of what was or may have

Powers v. Commonwealth.

been said in private conversation by others there present while the meeting was in progress. We do not understand that the statements of John L. Powers, *supra*, were admitted because of the time and place they were spoken, but because it had been shown *aliunde* that John L. Powers acted with appellant in bringing the large crowd to Frankfort, and knew and understood the full object in thus bringing them. Indeed, John L. Powers at that time is shown to have had his military company here, with their uniforms, arms, and equipments, and was a leader in command, and, it might be said, spoke as one with authority. This evidence would have been admissible if spoken at any other time and place, and because Powers spoke to Noaks the words of caution or warning to be on the alert at the time the meeting was in progress did not and could not render admissible evidence of the public proceedings of the meeting, as neither was a part of the other, nor explanatory thereof, and, in fact, had no connection the one with the other, save that of time and place. There was proof also of statements made by more persons in the crowd, but the whole of these declarations was admitted, and such proof did not warrant evidence of other statements made at a different time, even by the same parties and at the same place.

There is a yet stronger reason why this testimony was properly excluded. The whole testimony tends to show that the plans and purposes, as well as the fact, of their coming, was kept secret from the public. Cipher telegrams were sent, and messages were signed by initial instead of the full name, and such like acts, to keep the matter secret. Secrecy was enjoined by appellant on all. "It was a serious business they were undertaking," to use an

expression of appellant; and no rule of evidence would permit this armed body to prove for themselves, to establish their innocence, the fact that they held a public meeting on the capitol steps, and there passed resolutions declaring their peaceful mission and intentions, when, at the same time, they had arms and ammunition ready at hand in abundance, as well as smaller arms on their person. The law will not permit such proof as a person's own declarations of innocence to show that he is not guilty. Would any person suppose that this body of men would have assembled on the capitol steps, and by resolution have declared their purpose to be that of terrorizing and intimidating the members of the General Assembly, "or, if necessary," to use Powers' words, "kill Goebel to prevent him being Governor?" We say, if this was their purpose, would any person expect them to publicly so declare by resolution? If their purpose was a peaceable one, as the resolutions must of necessity declare, to be of benefit to appellant, why were all these warlike preparations made? Why these arms, ammunition, and soldier equipment brought? We think this testimony properly excluded.

It is also maintained that instruction 12 asked by appellant should have been given, to the effect that the evidence of A. R. Reed, J. B. Watkins, Zepakeal Seats, and N. C. Hazlewood could only be considered by the jury for the purpose of discrediting the witness Sparks, and not as substantive testimony against appellant. It is held by four members of the court that this testimony might have been considered as substantive evidence on the merits of the case if it had been given in chief, as there was testimony tending to show that Sparks was one of the conspirators, and, if this was true, his declarations were competent against appellant. It was on this ground the

court below refused to give the instruction; but it is said that, although this testimony would have been competent on the merits if admitted in chief, it could only be considered for the purpose of discrediting Sparks, as it was not introduced in chief, but as a part of the State's rebuttal testimony. There might be force in this position, if it appeared that appellant was in any wise prejudiced by the failure of the State to introduce this testimony at the proper point; but where he was not misled, and has had full opportunity to introduce all the testimony on the subjct that he desired, there seems little force in the objection. The trial court has a discretion to admit evidence in rebuttal which should have been admitted in chief, when, under the circumstances, it may appear right to do so, especially in a case involving a great multitude of facts like this; and this court never interferes with the exercise of a discretion of this character, unless palpably abused. The trial court did, however, give the jury instruction 6, which is as follows: "If the jury believe from the evidence beyond a reasonable doubt that a conspiracy was formed between the defendant and W. H. Culton, F. W. Golden, Green Golden, John L. Powers, John Davis, Charles Finley, W. S. Taylor, Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, or either or any of them, or with others to the jury unknown acting in concert with them, or either of them, to kill William Goebel, then, after the formation of said conspiracy, if any, every act and declaration of each of the conspirators, done or said in furtherance of the common design, before the consummation thereof, became the act or declaration of all engaged in the conspiracy." Under this instruction, no statement of Sparks could be considered by the jury, unless he was one of the conspirators,

and not then, unless it was made in furtherance of the common design. This was more favorable to the accused than the rule usually laid down by the authorities. When the fact of a conspiracy has been proved or established by reasonable inference, the acts and declarations of one conspirator in furtherance of, or made with reference to, the common design, are admissible in evidence against his associates." 6 Am. & Eng. Enc. Law (2d Ed.) 866. In the notes to the above, a large number of cases are collected. Under the instructions of the court as given, the testimony as to the declarations of Sparks could not be considered by the jury at all, unless it was shown beyond a reasonable doubt that Sparks was one of the conspirators, and the statements were made in furtherance of the conspiracy. We are therefore unable to see that the appellant has any ground of complaint in this matter.

It is also maintained that the court erred in giving to the jury instructions 4, 7, and 8; but it is difficult to perceive how either of these instructions furnishes any ground for a reversal of the judgment.

First. As to instruction No. 4: The idea the court aimed to present to the jury by this instruction was that if appellant conspired with others to bring a number of armed men to Frankfort for the purpose of intimidating the Legislature in its action on the contest before it, and in pursuance of said conspiracy advised the killing of members of the Legislature, and Goebel was killed by those in conspiracy or acting with them, in pursuance of said advice, appellant was guilty of murder. If the phraseology of the instruction is changed as indicated in the opinion, it would read as follows: "(4) If the jury believe from the evidence, beyond a reasonable doubt, that the defendant, Caleb Powers, conspired with, . . . or either or any of

them, or other person or persons unknown to the jury, acting with them, to bring a number of armed men to Frankfort for the purpose of doing an unlawful or crim- inal act, and in pursuance of such conspiracy defendant did advise, counsel, or encourage the killing of members of the Legislature, and that said William Goebel was a member of the Legislature, and was killed in pursuance of such advice, counsel, or encouragement, and that said killing was induced or brought about thereby, then the de- fendant is guilty of murder, whether the person who per- petrated the act which resulted in the death of William Goebel be identified or not, and it does not matter what change, if any, was made by the conspirators as to their original design, or the manner of accomplishing the un- lawful purpose of the conspiracy." If the instruction is put in this shape, the sense will be in no wise materially different from that given by the court below and quoted in the majority opinion. It undoubtedly expresses a sound principle of law; for if appellant, and those acting in con- cert with him, brought the armed men to Frankfort for an unlawful and criminal purpose, and he, in furtherance of the conspiracy, advised the killing by them of the members of the Legislature, and thus brought about the killing of Goebel, he was certainly guilty of murder, although a change was made in the plan or the manner of executing it. We are unable to see that there was any error in this matter. The words, "unlawful act," are defined in instruc- tion No. 7, which will next be considered.

Second. As to instruction No. 7: In 1 Roberson, Ky. Cr. Law, section 100, the author, illustrating the rule that "a conspiracy to commit a crime may be consummated, and the conspirators become guilty thereof, although the plan is not executed in exact accordance with the original

conception," well states the result of the authorities as follows: "So, if several persons conspire to invade a man's household, and go there armed with deadly weapons, for the purpose of attacking and beating him, and in furtherance of this common design one of them gets into a difficulty with him and kills him, the others being present or near at hand, the latter are guilty of murder, although they did not intend to kill. Where persons combine together for a general unlawful purpose, as 'to resist all opposers in the commission of a breach of the peace' and for that purpose assemble together and arm themselves, thus intending to resist the lawfully constituted authorities of the country, they are all answerable for anything done in the execution of it, and it is no defense that the parties had no well-defined or particular mischief in view as the result of their combination. If persons illegally concur in doing an act, they are guilty of a conspiracy, although they were not previously acquainted with each other. And the time when one entered into a conspiracy does not make any difference as to his responsibility for acts done to carry out the common purpose, the rule being that those who join in a conspiracy previously formed, and assist in its execution, become a party to all acts done by other parties, before or afterwards, in furtherance of the original design. The addition of new parties, subsequent to the formation of the conspiracy, does not destroy its identity, but it continues as the same conspiracy." In Peden v. State, 61 Miss., 268, several persons conspired to take the deceased from his house and whip him. In executing this purpose, one of them struck him a fatal blow with a spade, from which he died. All were held guilty of murder, whether they entertained a purpose to kill him or not. The same rule was announced in State

v. Shelledy, 8 Clarks, 478; Miller v. State, 25 Wis., 384; and Williams v. State, 81 Ala., 1, (1 South., 179). In 1 Hale, P. C., 441, the law is thus stated: "If divers persons come in one company to do an unlawful thing, as to kill, rob, or beat a man, or to commit a riot, or to do any other trespass, and one of them in doing thereof kill a man, this shall be adjudged murder in them all that are present of that party, abetting him and consenting to the act, or ready to aid him, although they did but look on." The same principle applies to those who set on foot and pro-cure the unlawful undertaking, though absent from the scene when the deed is done. Spies v. People, 122 Ill., 1, (12 N. E., 865), (17 N. E., 898); (3 Am. St. Rep., 320), and note. Thus, in Brennan v. People, 15 Ill., 512, several persons were indicted for murder. Instructions were asked to the effect that the jury should acquit certain of the pris-oners unless they actually participated in the killing of the deceased, or the killing was done pursuant to a common design to take his life on the part of the prisoners and those doing the act. The court said: "Such is not the law. The prisoners may be guilty of murder, although they neither took part in the killing, nor assented to any arrangement having for its object the death of Story. It is sufficient that they combined with those committing the deed to do an unlawful act, such as to beat or rob Story, and that he was killed in the attempt to execute the com-mon purpose. If several persons conspire to do an un-lawful act, and death happens in the prosecution of the com-mon object, all are alike guilty of the homicide." The rule is thus clearly stated in 6 Am. & Eng. Enc. Law (2d Ed.) p. 870: "When individuals associate themselves in an unlawful enterprise, any act done in pursuance of the conspiracy by one of the conspirators is, in legal contem-

plation, the act of all." And in a note this is added: "It is immaterial, as affecting the question of co-equal responsibility on the part of conspirators for the acts of each other, that one or more were not actually present at the consummation of the preconcerted design." At common law, if the object of the conspiracy be the commission of a felony, and a homicide is committed in carrying its design into execution, the killing is murder; and the authorities concur that if the unlawful act designed is dangerous, and probably requiring the use of force or violence, which may result in the taking of life, all the conspirators are criminally liable for whatever any of them may do in furtherance of the common design, whether they are present or not. 1 Bish. New Cr. Law, sections 633a, 636; Lamb v. People, 96 Ill., 73; U. S. v. Lancaster (C. C.) 44 Fed. 896, (10 L. R. A., 333); Boyd v. U. S., 142 U. S., 450, (12 Sup. Ct., 292), (35 L. Ed., 1077): U. S. v. Ross, 1 Gall., 624, Fed. Cas. No. 16,196; People v. Brown, 59 Cal., 351; Reeves v. Territory (Okl.) 61 Pac., 828.

Section 1241a, Kentucky Statutes, contains, among others, the followng provision: "(1) If any two or more persons shall confederate or band themselves together for the purpose of intimidating, alarming, disturbing, or injuring any person or persons, . . . they or either of them shall be deemed guilty of a felony, and upon conviction shall be confined in the penitentiary not less than one nor more than five years." It will thus be seen that it is made a felony for two or more persons to confederate themselves together for the purpose of intimidating or alarming another. Following the authorities we have cited and the foregoing statute, the court gave the jury instruction No. 7, in these words: "The court instructs the jury that if they believe from the evidence, beyond a

Powers v. Commonwealth.

reasonable doubt, that the defendant, Caleb Powers, con-
spired with W. H. Culton, F. W. Golden, Green Golden,
John L. Powers, John Davis, Charles Finley, W. S. Tay-
lor, Henry Youtsey, James Howard, Berry Howard, Har-
lan Whitaker, Richard Combs, or any one or more of them,
or with some other person or persons unknown to the
jury, acting with them or either of them, to do some un-
lawful act, and that in pursuance of such conspiracy, or in
furtherance thereof, the said Henry Youtsey, James How-
ard, Berry Howard, Harlan Whitaker, Richard Combs, or
some one of them, or some other person unknown to the
jury, acting with them, or with those who conspired with
the defendant, if any such conspiracy there was, to do
the unlawful act, did shoot and kill William Goebel, the
defendant is guilty, although the jury may believe from
the evidence that the original purpose was not to procure
or bring about the death of William Goebel, but was for
some other unlawful and criminal purpose. The words
'unlawful act,' as used in this instruction, mean some act
to alarm, to excite terror, or the infliction of bodily harm."
Not a few authorities hold that if the conspiracy involves
the commission of a felony, and a homicide is committed
by any of the conspirators collaterally to the main de-
sign, and not in pursuance of it, all are guilty of murder.
It will be observed that the court did not so instruct
the jury, but that by the instruction quoted above they
were plainly told that the homicide must have been com-
mitted in pursuance of the conspiracy or in furtherance
of it. The instruction was intended to present to the
jury this phase of the case shown by the evidence: While
the Legislature had before it the election contest, appel-
lant and a number of others entered into a conspiracy to
bring to Frankfort a large body of armed men, some of

them feudists, and others known for their dangerous character, for the purpose of intimidating the Legislature in the discharge of its official duties, and pursuant to this conspiracy they got together about 1,000 men, and brought them to Frankfort. This body reached Frankfort on January 25th. Most of them were sent home that evening, but about 200 picked men were retained, and were still at Frankfort, armed, collected about the State house, and crowding the lobbies from day to day, until the deceased was killed, on January 30th. On January 25th, a number of these men undertook to force their way into the hall of the house of representatives, and a catastrophe was then narrowly averted by the prudence of the speaker. A conspiracy of such a character was of necessity dangerous to life, and subversive of the foundations of the State government. No one realized the gravity of the undertaking better than appellant, for, in his letter written while getting his men together, he said, as quoted above: "We must have these men and guns. We are undertaking a serious matter, and win we must." His friend, the banker, John A. Black, says: "He said he wanted an armed mob, . . . and that it would likely have an influence over the Legislature." As we understand the court, the instruction is held erroneous for the reason that it does not submit to the jury the question whether the homicide was the natural result of the conspiracy, or such a thing as might be ordinarily expected to happen. It is not necessary that the death of the deceased should have been contemplated as the probable result of the conspiracy. If the conspiracy was such that the conspirators must naturally have contemplated that it would result in violence, or that the infliction of personal harm upon others might reasonably be antici-

pated in its execution, then all are responsible for the homicide. On the facts of the case, it would have been both idle and improper to have submitted to the jury whether the death of the deceased was a result reasonably to be anticipated by those entering the conspiracy; for the character of the conspiracy was such as necessarily involved a show of force, and deeds of violence were plainly within its probable consequences. It is wholly immaterial whether the death of the deceased was anticipated, or the death of any other person in particular. Such a crime against good government can not be tolerated among a law-loving people, and those who undertake to stop the ordinary processes of the law by intimidation and force must be held responsible for all the consequences of what is done in furtherance of the design. The court might properly have instructed the jury, in plain words, that if there was a conspiracy to bring a band of armed men to Frankfort for the purpose of intimidating the Legislature in the discharge of its official duties, and the men were so brought to Frankfort, and the deceased was killed in furtherance of this conspiracy, or in pursuance of it, by any one of these men or of those in the conspiracy, appellant, if a party to the conspiracy, was guilty of murder. The instruction he gave is more favorable to the appellant than the one indicated; for the reason that it states to the jury the general rule of law, without directing their attention to the particular facts of the case. The court, no doubt, put his instruction in this form for the benefit of the appellant, and to conform to a line of decisions by this court condemning instructions giving prominence to certain facts. The instruction appears to us

to be not only unobjectionable in point of law, but to be more favorable to the appellant than the law required.

Third.　As to instruction No. 8: Section 241 of the Criminal Code of Practice provides: "A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof." Following the words of the statute, the trial court gave instruction No. 8, which is as follows: "The jury can not convict the defendant upon the testimony of an accomplice, unless such testimony be corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof." It is maintained that the instruction is misleading, as there were several accomplices who testified on the trial, and under it the jury may have understood they were warranted in convicting on the testimony of one accomplice when supported by another, and that thus appellant might be convicted on the testimony of accomplices without other corroborating evidence. The statute clearly does not allow this; for this would be but a conviction "upon the testimony of an accomplice." The words, "unless corroborated by other evidence," clearly refer to other evidence than the testimony of an accomplice. The instruction is in the words of the statute, and conveys the same meaning, although the sense might have been made plainer by adding an "s" to the word "accomplice," and omitting the word "an," so as to make the clause read: "The jury can not convict the defendant upon the testimony of accomplices, unless," etc.

Powers v. Commonwealth.

The testimony of the accomplices as to the vital facts was corroborated by other evidence, and by circumstances established beyond question.  It is clearly shown that appellant was not only a party to, but a leading spirit in, the conspiracy to bring to Frankfort and keep here the band of men, supplied with arms and ammunition.  Such things are not done vainly or without a purpose.  No jury of intelligence could believe that such an armament could be organized and brought to the seat of government but for the purpose of intimidation.  Whether they might not also infer, from the fact that so many of the State militia were brought along dressed in citizens' clothes, that the purpose was to use this militia as State troops to protect them from arrest, or to hold their own against the civil authorities, we need not determine.  In any view of the facts, the enterprise was a felony, producing a condition of anarchy at the State government, and the peace and good name of the State require that the majesty of the law should be upheld in such a manner that it will not be repeated.  It, of necessity, contemplated such a state of things that violence, if not bloodshed, would follow in its wake, and where a homicide was committed in furtherance of it, appellant, who was its director, was clearly guilty of murder.

To reverse the judgment of conviction on the facts which are either admitted, or so clearly established as to be beyond controversy, is not only to delay justice, but to give no force to the statute providing that such judgments may only be reversed when, on the whole record, the court is satisfied the substantial rights of the accused have been prejudiced.  We therefore dissent from the opinion of the court.

Chief Justice Paynter and Judge Hobson concur in this dissent.

The appellant filed a petition for extension of the court's opinion to which Judge DuRelle made the following response:

The court is of opinion that the defense should have been permitted to contradict the witness Sinclair's denial of a conversation asked for on cross-examination which tended, if true, to show that his testimony had been purchased. The majority are also of opinion that a witness may be permitted to explain what he meant by spoken words, but not what he meant by written words, unless ambiguity exists as to their meaning, and, further, that the rulings of the trial court as to the admissibility of explanations of written words were correct. To the extent indicated, the opinion is extended, and the petition is overruled.